# UNITED HOUSING FOUNDATION, INC., ET AL. *v.* FORMAN ET AL.

No. 74–157.   Argued April 22, 1975—Decided June 16, 1975*

---

*Together with No. 74–647, *New York et al.* v. *Forman et al.,* also on certiorari to the same court.

838

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Marshall, Blackmun, and Rehnquist, JJ., joined. Brennan, J., filed a dissenting opinion, in which Douglas and White, JJ., joined, *post*, p. 860.

*Simon H. Rifkind* argued the cause for petitioners in No. 74–157. With him on the briefs was *Martin London. Daniel M. Cohen,* Assistant Attorney General of New

■■■■■■■■■

■■■■■■■■■

York, argued the cause for petitioners in No. 74-647. With him on the briefs were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.

*Louis Nizer* argued the cause for respondents in both cases. With him on the brief were *George Berger, Jay F. Gordon, Ira B. Rose,* and *Janet P. Kane.*

*Paul Gonson* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Bork, Lawrence E. Nerheim,* and *Richard E. Nathan.*†

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in these cases is whether shares of stock entitling a purchaser to lease an apartment in Co-op City, a state subsidized and supervised nonprofit housing cooperative, are "securities" within the purview of the Securities Act of 1933 and the Securities Exchange Act of 1934.

I

Co-op City is a massive housing cooperative in New York City. Built between 1965 and 1971, it presently houses approximately 50,000 people on a 200-acre site containing 35 high-rise buildings and 236 town houses. The project was organized, financed, and constructed under the New York State Private Housing Finance Law, commonly known as the Mitchell-Lama Act, enacted to ameliorate a perceived crisis in the availability of decent low-income urban housing. In order to encourage pri-

---

†*William J. Brown,* Attorney General, *William G. Compton,* Assistant Attorney General, *Jon M. Sebaly,* Special Assistant Attorney General, and *Michael R. Merz* filed a brief for the State of Ohio as *amicus curiae* urging reversal.

vate developers to build low-cost cooperative housing, New York provides them with large long-term, low-interest mortgage loans and substantial tax exemptions. Receipt of such benefits is conditioned on a willingness to have the State review virtually every step in the development of the cooperative. See N. Y. Priv. Hous. Fin. Law §§ 11–37, as amended (1962 and Supp. 1974–1975). The developer also must agree to operate the facility "on a nonprofit basis," § 11–a (2a), and he may lease apartments only to people whose incomes fall below a certain level and who have been approved by the State.[1]

The United Housing Foundation (UHF), a nonprofit membership corporation established for the purpose of "aiding and encouraging" the creation of "adequate, safe and sanitary housing accommodations for wage earners and other persons of low or moderate income," [2] Appendix in Court of Appeals 95a (hereafter App.), was responsible for initiating and sponsoring the development of Co-op City. Acting under the Mitchell-Lama Act, UHF organized the Riverbay Corporation (Riverbay) to own and operate the land and buildings constituting Co-op City. Riverbay, a nonprofit cooperative housing corporation, issued the stock that is the subject of this litigation. UHF also contracted with Community Services, Inc. (CSI), its wholly owned subsidiary, to serve as the general contractor and sales

[1] Eligibility is limited to families whose monthly income does not exceed six times the monthly rental charge (or for families of four or more, seven times the rental charge). N. Y. Priv. Hous. Fin. Law § 31 (2)(a) (Supp. 1974–1975). Preference in admission must be given to veterans, the handicapped, and the elderly. § 31 (7)–(9).

[2] UHF is composed of labor unions, housing cooperatives, and civic groups. It has sponsored the construction of several major housing cooperatives in New York City.

agent for the project.[3]   As required by the Mitchell-Lama Act, these decisions were approved by the State Housing Commissioner.

To acquire an apartment in Co-op City an eligible prospective purchaser[4] must buy 18 shares of stock in Riverbay for each room desired.   The cost per share is $25, making the total cost $450 per room, or $1,800 for a four-room apartment.   The sole purpose of acquiring these shares is to enable the purchaser to occupy an apartment in Co-op City; in effect, their purchase is a recoverable deposit on an apartment.   The shares are explicitly tied to the apartment: they cannot be transferred to a nontenant; nor can they be pledged or encumbered; and they descend, along with the apartment, only to a surviving spouse.   No voting rights attach to the shares as such: participation in the affairs of the cooperative appertains to the apartment, with the residents of each apartment being entitled to one vote irrespective of the number of shares owned.

Any tenant who wants to terminate his occupancy, or who is forced to move out,[5] must offer his stock to Riverbay at its initial selling price of $25 per share.   In the extremely unlikely event that Riverbay declines to repurchase the stock,[6] the tenant cannot sell it for more than

---

[3] CSI is a business corporation that has acted as the contractor on several UHF-sponsored housing cooperatives.

[4] Respondents are referred to herein variously as "purchasers," "owners," or "tenants."   Respondents do not hold legal title to their respective apartments, but they are purchasers and owners of the shares of Riverbay which entitles them to occupy the apartments. By virtue of their right of occupancy, respondents are usually described as tenants.

[5] A tenant can be forced to move out if he violates the provisions of his "occupancy agreement," which is essentially a lease for the apartment, or if his income grows to exceed the eligibility standards.

[6] To date every family that has withdrawn from Co-op City has received back its initial payment in full.   Indeed, at the time this

the initial purchase price plus a fraction of the portion of the mortgage that he has paid off, and then only to a prospective tenant satisfying the statutory income eligibility requirements. See N. Y. Priv. Hous. Fin. Law § 31–a (Supp. 1974–1975).

In May 1965, subsequent to the completion of the initial planning, Riverbay circulated an Information Bulletin seeking to attract tenants for what would someday be apartments in Co-op City. After describing the nature and advantages of cooperative housing generally and of Co-op City in particular, the Bulletin informed prospective tenants that the total estimated cost of the project, based largely on an anticipated construction contract with CSI, was $283,695,550. Only a fraction of this sum, $32,795,550, was to be raised by the sale of shares to tenants. The remaining $250,900,000 was to be financed by a 40-year low-interest mortgage loan from the New York Private Housing Finance Agency. After construction of the project the mortgage payments and current operating expenses would be met by monthly rental charges paid by the tenants. While these rental charges were to vary, depending on the size, nature, and location of an apartment, the 1965 Bulletin estimated that the "average" monthly cost would be $23.02 per room, or $92.08 for a four-room apartment.

Several times during the construction of Co-op City, Riverbay, with the approval of the State Housing Commissioner, revised its contract with CSI to allow for increased construction costs. In addition, Riverbay incurred other expenses that had not been reflected in the

---

suit was filed there were 7,000 families on the waiting list for apartments in this cooperative. In addition, a special fund of nearly $1 million had been established by small monthy contributions from all tenants to insure that those wanting to move out would receive full compensation for their shares.

1965 Bulletin. To meet these increased expenditures, Riverbay, with the Commissioner's approval, repeatedly secured increased mortgage loans from the State Housing Agency. Ultimately the construction loan was $125 million more than the figure estimated in the 1965 Bulletin. As a result, while the initial purchasing price remained at $450 per room, the average monthly rental charges increased periodically, reaching a figure of $39.68 per room as of July 1974.[7]

These increases in the rental charges precipitated the present lawsuit. Respondents, 57 residents of Co-op City, sued in federal court on behalf of all 15,372 apartment owners, and derivatively on behalf of Riverbay, seeking upwards of $30 million in damages, forced rental reductions, and other "appropriate" relief. Named as defendants (petitioners herein) were UHF, CSI, Riverbay, several individual directors of these organizations, the State of New York, and the State Private Housing Finance Agency. The heart of respondents' claim was that the 1965 Co-op City Information Bulletin falsely represented that CSI would bear all subsequent cost increases due to factors such as inflation. Respondents further alleged that they were misled in their purchases of shares since the Information Bulletin failed to disclose several critical facts.[8] On these bases,

---

[7] As the rental charges increased, the income eligibility requirements for residents of Co-op City expanded accordingly. See n. 1, *supra.*

[8] Respondents maintained that the following material facts were omitted: (i) the original estimated cost had never been adhered to in any of the previous Mitchell-Lama projects sponsored by UHF and built by CSI; (ii) petitioners knew that the initial estimate would not be followed in the present project; (iii) CSI was a wholly owned subsidiary of UHF; (iv) CSI's net worth was so small that it could not have been legally held to complete the contract within the original estimated costs; (v) the State Housing Commissioner

respondents asserted two claims under the fraud provisions of the federal Securities Act of 1933, as amended, § 17 (a), 48 Stat. 84, 15 U. S. C. § 77q (a); the Securities Exchange Act of 1934, as amended, § 10 (b), 48 Stat. 891, 15 U. S. C. § 78j (b); and 17 CFR § 240.10b–5 (1975). They also presented a claim against the State Financing Agency under the Civil Rights Act of 1871, 42 U. S. C. § 1983, and 10 pendent state-law claims.

Petitioners, while denying the substance of these allegations,[9] moved to dismiss the complaint on the ground that federal jurisdiction was lacking. They maintained that shares of stock in Riverbay were not "securities" within the definitional sections of the federal Securities Acts. In addition, the state parties moved to dismiss on sovereign immunity grounds.

The District Court granted the motion to dismiss. *Forman* v. *Community Services, Inc.,* 366 F. Supp. 1117 (SDNY 1973). It held that the denomination of the shares in Riverbay as "stock" did not, by itself, make them securities under the federal Acts. The court further ruled, relying primarily on this Court's decisions in *SEC* v. *C. M. Joiner Leasing Corp.,* 320 U. S. 344 (1943), and *SEC* v. *W. J. Howey Co.,* 328 U. S. 293 (1946), that the purchase in issue was not a security transaction since it was not induced by an offer of tangible material profits, nor could such profits realistically be expected. In the District Court's words, it was

had waived his own rule regarding liquidity requirements in approving CSI as the contractor; and (vi) there was an additional undisclosed contract between CSI and Riverbay.

[9] Petitioners asserted that the Information Bulletin warned purchasers of the possibility of rental increases, and denied that it omitted material facts. They also argued that prior to occupancy all tenants were informed that rental charges had increased. In any event, petitioners claimed that respondents have suffered no damages since they may move out and retrieve their initial investments in full.

"the fundamental nonprofit nature of this transaction" which presented "the insurmountable barrier to [respondents'] claims in th[e] federal court." 366 F. Supp., at 1128.[10]

The Court of Appeals for the Second Circuit reversed. *Forman* v. *Community Services, Inc.*, 500 F. 2d 1246 (1974). It rested its decision on two alternative grounds. First, the court held that since the shares purchased were called "stock" the Securities Acts, which explicitly include "stock" in their definitional sections, were literally applicable. Second, the Court of Appeals concluded that the transaction was an investment contract within the meaning of the Acts and as defined by *Howey,* since there was an expectation of profits from three sources: (i) rental reductions resulting from the income produced by the commercial facilities established for the use of tenants at Co-op City; (ii) tax deductions for the portion of the monthly rental charges allocable to interest payments on the mortgage; and (iii) savings based on the fact that apartments at Co-op City cost substantially less than comparable nonsubsidized housing. The court further ruled that the immunity claims by the state parties were unavailing.[11] Accordingly, the

---

[10] The District Court also dismissed the § 1983 claim finding that the "federal securities allegations represent the only well-pleaded underlying basis for jurisdiction under the Civil Rights Act." 366 F. Supp. 1117, 1132 (1973). In view of these rulings the court did not reach the sovereign immunity claims.

[11] The Court of Appeals held that the state agency was independent and distinct from the State itself and therefore was a "person" for purposes of § 1983, that both the agency and the State had waived immunity under § 32 (5) of the Private Housing Finance Law, and that the State had also implicitly waived its immunity by voluntarily participating in the sale of securities, an area subject to plenary federal regulation. See *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964). In view of our disposition of these cases we do not reach these issues.

case was remanded to the District Court for consideration of respondents' claims on the merits.

In view of the importance of the issues presented we granted certiorari. 419 U. S. 1120 (1975). As we conclude that the disputed transactions are not purchases of securities within the contemplation of the federal statutes, we reverse.

## II

Section 2 (1) of the Securities Act of 1933, 15 U. S. C. § 77b (1), defines a "security" as

> "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." [12]

In providing this definition Congress did not attempt to articulate the relevant economic criteria for distinguishing "securities" from "non-securities." Rather, it sought to define "the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world

---

[12] The definition of a security in § 3 (a) (10) of the 1934 Act, 15 U. S. C. § 78c (a) (10), is virtually identical and, for present purposes, the coverage of the two Acts may be considered the same. See *Tcherepnin* v. *Knight*, 389 U. S. 332, 336, 342 (1967); S. Rep. No. 792, 73d Cong., 2d Sess., 14 (1934).

fall within the ordinary concept of a security." H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933). The task has fallen to the Securities and Exchange Commission (SEC), the body charged with administering the Securities Acts, and ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of these statutes.

In making this determination in the present case we do not write on a clean slate. Well-settled principles enunciated by this Court establish that the shares purchased by respondents do not represent any of the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *Howey*, 328 U. S., at 299, and therefore do not fall within "the ordinary concept of a security."

## A

We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," [13] must be considered a security transaction simply because the statutory definition of a security includes the words "any . . . stock." Rather we adhere to the basic principle that has guided all of the Court's decisions in this area:

> "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin* v. *Knight*, 389 U. S. 332, 336 (1967).

See also *Howey, supra,* at 298.

---

[13] While the record does not indicate precisely why the term "stock" was used for the instant transaction, it appears that this form is generally used as a matter of tradition and convenience. See P. Rohan & M. Reskin, Cooperative Housing Law & Practice § 2.01 (4) (1973).

The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:

> "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, 459 (1892).

See also *United States* v. *American Trucking Assns.,* 310 U. S. 534, 543 (1940).[14]

Respondents' reliance on *Joiner* as support for a "literal approach" to defining a security is misplaced. The issue in *Joiner* was whether assignments of interests in oil leases, coupled with the promoters' offer to drill an exploratory well, were securities. Looking to the economic

---

[14] With the exception of the Second Circuit, every Court of Appeals recently to consider the issue has rejected the literal approach urged by respondents. See *C. N. S. Enterprises, Inc.* v. *G. & G. Enterprises, Inc.,* 508 F. 2d 1354 (CA7 1975); *McClure* v. *First National Bank of Lubbock,* 497 F. 2d 490 (CA5 1974), cert. denied, 420 U. S. 930 (1975); *Lino* v. *City Investing Co.,* 487 F. 2d 689 (CA3 1973). See also 1 L. Loss, Securities Regulation 493 (2d ed. 1961) ("substance governs rather than form: . . . just as some things which look like real estate are securities, some things which look like securities are real estate").

inducement provided by the proposed exploratory well, the Court concluded that these leases were securities even though "leases" as such were not included in the list of instruments mentioned in the statutory definition. In dictum the Court noted that "[i]nstruments *may* be included within [the definition of a security], as [a] matter of law, if on their face they answer to the name or description." 320 U. S., at 351 (emphasis supplied). And later, again in dictum, the Court stated that a security *"might"* be shown "by proving the document itself, which on its face would be a note, a bond, or a share of stock." *Id.*, at 355 (emphasis supplied). By using the conditional words "may" and "might" in these dicta the Court made clear that it was not establishing an inflexible rule barring inquiry into the economic realities underlying a transaction. On the contrary, the Court intended only to make the rather obvious point that, in contrast to the instrument before it which was not included within the explicit statutory terms, most instruments bearing these traditional titles are likely to be covered by the statutes.[15]

In holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply.

---

[15] Nor can respondents derive any support for a literal approach from *Tcherepnin* v. *Knight, supra,* which quoted the *Joiner* dictum. Indeed in *Tcherepnin* the Court explicitly stated that "form should be disregarded for substance," 389 U. S., at 336, and only after analyzing the economic realities of the transaction at issue did it conclude that an instrument called a "withdrawable capital share" was, in substance, an "investment contract," a share of "stock," a "certificate of interest or participation in [a] profit-sharing agreement," and a "transferable share."

This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.

In the present case respondents do not contend, nor could they, that they were misled by use of the word "stock" into believing that the federal securities laws governed their purchase. Common sense suggests that people who intend to acquire only a residential apartment in a state-subsidized cooperative, for their personal use, are not likely to believe that in reality they are purchasing investment securities simply because the transaction is evidenced by something called a share of stock. These shares have none of the characteristics "that in our commercial world fall within the ordinary concept of a security." H. R. Rep. No. 85, *supra,* at 11. Despite their name, they lack what the Court in *Tcherepnin* deemed the most common feature of stock: the right to receive "dividends contingent upon an apportionment of profits." 389 U. S., at 339. Nor do they possess the other characteristics traditionally associated with stock: they are not negotiable; they cannot be pledged or hypothecated; they confer no voting rights in proportion to the number of shares owned; and they cannot appreciate in value. In short, the inducement to purchase was solely to acquire subsidized low-cost living space; it was not to invest for profit.

## B

The Court of Appeals, as an alternative ground for its decision, concluded that a share in Riverbay was also an "investment contract" as defined by the Securities Acts. Respondents further argue that in any event what they agreed to purchase is "commonly known as a 'security' " within the meaning of these laws. In considering these claims we again must examine the substance—the economic realities of the transaction—rather than the

names that may have been employed by the parties. We perceive no distinction, for present purposes, between an "investment contract" and an "instrument commonly known as a 'security.'" In either case, the basic test for distinguishing the transaction from other commercial dealings is

> "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey*, 328 U. S., at 301.[16]

This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner, supra* (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin* v. *Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is "attracted solely by the prospects of a return" on his investment. *Howey, supra,* at 300. By contrast, when a purchaser is motivated by a

---

[16] This test speaks in terms of "profits to come *solely* from the efforts of others." (Emphasis supplied.) Although the issue is not presented in this case, we note that the Court of Appeals for the Ninth Circuit has held that "the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." *SEC* v. *Glenn W. Turner Enterprises*, 474 F. 2d 476, 482, cert. denied, 414 U. S. 821 (1973). We express no view, however, as to the holding of this case.

desire to use or consume the item purchased—"to occupy the land or to develop it themselves," as the *Howey* Court put it, *ibid.*—the securities laws do not apply.[17]   See also *Joiner, supra.*[18]

In the present case there can be no doubt that investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments.   The Information Bulletin distributed to prospective residents emphasized the fundamental nature and purpose of the undertaking:

"A cooperative is a non–profit enterprise owned and controlled democratically by its members—the people who are using its services. . . .

.        .        .        .        .

"People find living in a cooperative community enjoyable for more than one reason.   Most people join, however, for the simple reason that it is a way to obtain decent housing at a reasonable price.

----

[17] In some transactions the investor is offered both a commodity or real estate for use and an expectation of profits.   See SEC Release No. 33–5347, 38 Fed. Reg. 1735 (Jan. 18, 1973).   See generally Rohan, The Securities Law Implications of Condominium Marketing Programs Which Feature a Rental Agency or Rental Pool, 2 Conn. L. Rev. 1 (1969).   The application of the federal securities laws to these transactions may raise difficult questions ·that are not present in this case.

[18] In *Joiner*, 320 U. S., at 348, the Court stated:

"Undisputed facts seem to us, however, to establish the conclusion that defendants were not, as a practical matter, offering naked leasehold rights.   Had the offer mailed by defendants omitted the economic inducements of the proposed and promised exploration well, it would have been a quite different proposition."

This distinction was critical because the exploratory drillings gave the investments "most of their value and all of their lure." *Id.,* at 349.   The land itself was purely an incidental consideration in the transaction.

However, there are other advantages. The purpose of a cooperative is to provide home ownership, not just apartments to rent. The community is designed to provide a favorable environment for family and community living. . . .

"The common bond of collective ownership which you share makes living in a cooperative different. It is a community of neighbors. Home ownership, common interests and the community atmosphere make living in a cooperative like living in a small town. As a rule there is very little turnover in a cooperative." App. 162a, 166a.

Nowhere does the Bulletin seek to attract investors by the prospect of profits resulting from the efforts of the promoters or third parties. On the contrary, the Bulletin repeatedly emphasizes the "nonprofit" nature of the endeavor. It explains that if rental charges exceed expenses the difference will be returned as a rebate, not invested for profit. It also informs purchasers that they will be unable to resell their apartments at a profit since the apartment must first be offered back to Riverbay "at the price . . . paid for it." [19] *Id.,* at 163a. In short, neither of the kinds of profits traditionally associated with securities was offered to respondents.

The Court of Appeals recognized that there must be an expectation of profits for these shares to be securities, and conceded that there is "no possible profit on a resale of [this] stock." 500 F. 2d, at 1254. The court cor-

---

[19] This requirement effectively insures that no apartment will be sold for more than its original cost. Consonant with the purposes of the Mitchell-Lama Act, whenever there are prospective buyers willing to pay as much as the initial purchase price for an apartment in Co-op City, Riverbay will repurchase the apartment and resell it at its original cost. See App. 138a. If, for some reason, Riverbay does not purchase the apartment the tenant still cannot make a profit on his sale. See *supra,* at 842–843.

rectly noted, however, that profit may be derived from the income yielded by an investment as well as from capital appreciation, and then proceeded to find "an expectation of 'income' in at least three ways." *Ibid.* Two of these supposed sources of income or profits may be disposed of summarily. We turn first to the Court of Appeals' reliance on the deductibility for tax purposes of the portion of the monthly rental charge applied to interest on the mortgage. We know of no basis in law for the view that the payment of interest, with its consequent deductibility for tax purposes, constitutes income or profits.[20] These tax benefits are nothing more than that which is available to any homeowner who pays interest on his mortgage. See § 216 of Internal Revenue Code, 26 U. S. C. § 216; *Eckstein* v. *United States,* 196 Ct. Cl. 644, 452 F. 2d 1036 (1971).

The Court of Appeals also found support for its concept of profits in the fact that Co-op City offered space at a cost substantially below the going rental charges for comparable housing. Again, this is an inappropriate theory of "profits" that we cannot accept. The low rent derives from the substantial financial subsidies provided by the State of New York. This benefit cannot be liquidated into cash; nor does it result from the managerial efforts of others. In a real sense, it no more embodies the attributes of income or profits than do welfare benefits, food stamps, or other government subsidies.

The final source of profit relied on by the Court of Appeals was the possibility of net income derived from the leasing by Co-op City of commercial facilities, pro-

---

[20] Even if these tax deductions were considered profits, they would not be the type associated with a security investment since they do not result from the managerial efforts of others. See Rosenbaum, The Resort Condominium and the Federal Securities Laws—A Case Study in Governmental Inflexibility, 60 Va. L. Rev. 785, 795–796 (1974); Note, 62 Geo. L. J. 1515, 1524–1526 (1974).

fessional offices and parking spaces, and its operation of community washing machines. The income, if any, from these conveniences, all located within the common areas of the housing project, is to be used to reduce tenant rental costs. Conceptually, one might readily agree that net income from the leasing of commercial and professional facilities is the kind of profit traditionally associated with a security investment.[21] See *Tcherepnin* v. *Knight, supra.* But in the present case this income—if indeed there is any—is far too speculative and insubstantial to bring the entire transaction within the Securities Acts.

Initially we note that the prospect of such income as a means of offsetting rental costs is never mentioned in the Information Bulletin. Thus it is clear that investors were not attracted to Co-op City by the offer of these potential rental reductions. See *Joiner,* 320 U. S., at 353. Moreover, nothing in the record suggests that the facilities in fact return a profit in the sense that the leasing fees are greater than the actual cost to Co-op City of the space rented.[22] The short of the matter is

---

[21] The "income" derived from the rental of parking spaces and the operation of washing machines clearly was not profit for respondents since these facilities were provided exclusively for the use of tenants. Thus, when the income collected from the use of these facilities exceeds the cost of their operation the tenants simply receive the return of the initial overcharge in the form of a rent rebate. Indeed, it could be argued that the "income" from the commercial and professional facilities is also, in effect, a rebate on the cost of goods and services purchased at these facilities since it appears likely that they are patronized almost exclusively by Co-op City residents. See Note, 53 Tex. L. Rev. 623, 630–631, n. 38 (1975).

[22] The Court of Appeals quoted the gross rental income received from these facilities. But such figures by themselves are irrelevant since the record does not indicate the cost to Co-op City of providing and maintaining the rented space.

that the stores and services in question were established not as a means of returning profits to tenants, but for the purpose of making essential services available for the residents of this enormous complex.[23] By statute these facilities can only be "incidental and appurtenant" to the housing project. N. Y. Priv. Hous. Fin. Law § 12 (5) (Supp. 1974–1975). Undoubtedly they make Co-op City a more attractive housing opportunity, but the possibility of some rental reduction is not an "expectation of profit" in the sense found necessary in *Howey*.[24]

---

[23] See generally Miller, Cooperative Apartments: Real Estate or Securities?, 45 B. U. L. Rev. 465, 500 (1965).

[24] Respondents urge us to abandon the element of profits in the definition of securities and to adopt the "risk capital" approach articulated by the California Supreme Court in *Silver Hills Country Club* v. *Sobieski*, 55 Cal. 2d 811, 361 P. 2d 906 (1961). Cf. *El Khadem* v. *Equity Securities Corp.*, 494 F. 2d 1224 (CA9), cert. denied, 419 U. S. 900 (1974). See generally Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 W. Res. L. Rev. 367 (1967); Long, An Attempt to Return "Investment Contracts" to the Mainstream of Securities Regulation, 24 Okla. L. Rev. 135 (1971); Hannan & Thomas, The Importance of Economic Reality and Risk in Defining Federal Securities, 25 Hastings L. J. 219 (1974). Even if we were inclined to adopt such a "risk capital" approach we would not apply it in the present case. Purchasers of apartments in Co-op City take no risk in any significant sense. If dissatisfied with their apartments, they may recover their initial investment in full. See n. 5, *supra*.

Respondents assert that if Co-op City becomes bankrupt they stand to lose their whole investment. But, in view of the fact that the State has financed over 92% of the cost of construction and carefully regulates the development and operation of the project, bankruptcy in the normal sense is an unrealistic possibility. In any event, the risk of insolvency of an ongoing housing cooperative "differ[s] vastly" from the kind of risk of "fluctuating" value associated with securities investments. *SEC* v. *Variable Annuity Co.*, 359 U. S. 65, 90–91 (1959) (BRENNAN, J., concurring). See Hannan & Thomas, *supra*, at 242–249; Long, Introduction to Symposium: Interpreting the Statutory Definition of a Security: Some Pragmatic Considerations, 6 St. Mary's L. J. 96, 126–128 (1974).

There is no doubt that purchasers in this housing cooperative sought to obtain a decent home at an attractive price. But that type of economic interest characterizes every form of commercial dealing. What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use.[25]

---

[25] The SEC has filed an *amicus curiae* brief urging us to hold the federal securities laws applicable to this case. Traditionally the views of an agency charged with administering the governing statute would be entitled to considerable weight. See, *e. g., Saxbe* v. *Bustos*, 419 U. S. 65, 74 (1974); *Investment Company Institute* v. *Camp*, 401 U. S. 617, 626–627 (1971). But in this case the SEC's position flatly contradicts what appears to be a rather careful statement of the Commission's views in a recent release. In Release No. 33–5347, 38 Fed. Reg. 1735 (Jan. 18, 1973), applicable to the "sale of condominium units, or other units in a real estate development," the SEC stated its view that only those real estate investments that are "offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter," are to be considered securities. *Id.,* at 1736. In particular, the Commission explained that the Securities Acts do not apply when "commercial facilities are a part of the common elements of a residential project" if

"(a) the income from such facilities is used only to offset common area expenses and (b) the operation of such facilities is incidental to the project as a whole and are not established as a primary income source for the individual owners of a condominium or cooperative unit." *Ibid.*

See also SEC Real Estate Advisory Committee Report 74–91 (1972); Dickey & Thorpe, Federal Security Regulation of Condominium Offerings, 19 N. Y. L. F. 473 (1974).

Several commentators have noted the inconsistency between the SEC's position in the above release and the decision by the Court of Appeals in this case, which the SEC now supports. See Berman & Stone, Federal Securities Law and the Sale of Condominiums,

## III

In holding that there is no federal jurisdiction, we do not address the merits of respondents' allegations of fraud. Nor do we indicate any view as to whether the type of claims here involved should be protected by federal regulation.[26] We decide only that the type of

Homes, and Homesites, 30 Bus. Law. 411, 420–425 (1975); Comment, Condominium Regulation: Beyond Disclosure, 123 U. Pa. L. Rev. 639, 654–655 (1975); Note, *supra,* n. 20, at 628. In view of this unexplained contradiction in the Commission's position we accord no special weight to its views. See *Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S. 418, 426 (1972); *Blue Chip Stamps* v. *Manor Drug Stores, ante,* at 746–747, n. 10.

[26] It has been suggested that the sale of housing developments such as condominiums and cooperatives is in need of federal regulation and therefore the securities laws should be construed or amended to reach these transactions. See, *e. g.,* Note, Federal Securities Regulation of Condominiums: A Purchaser's Perspective, 62 Geo. L. J. 1403 (1974); Note, Cooperative Housing Corporations and the Federal Securities Laws, 71 Col. L. Rev. 118 (1971). Others have disagreed, claiming that the extensive body of regulation developed over more than four decades under these Acts would be inappropriate and unduly costly to the sellers and buyers of residential housing. See Berman & Stone, *supra,* n. 24; Note, *supra,* n. 20. Moreover, extension of the securities laws to real estate transactions would involve important questions as to the appropriate balance between state and federal responsibility. The determination of whether and in what manner federal regulation may be required for housing transactions, where the characteristics of an investment in securities are not present, is better left to the Congress, which can assess both the costs and benefits of any such regulation. Indeed only recently Congress instructed the Secretary of Housing and Urban Development "to conduct a full and complete investigation and study . . . with respect to . . . the problems, difficulties, and abuses or potential abuses applicable to condominium and cooperative housing." § 821, 88 Stat. 740, 42 U. S. C. § 3532 (1970 ed., Supp. IV). See also Real Estate Settlement Procedures Act of 1974, 88 Stat. 1724, 12 U. S. C. § 2601 *et seq.* (1970 ed., Supp. IV); Interstate Land Sales Full Disclosure Act, 82 Stat. 590, 15 U. S. C. §§ 1701–1720.

transaction before us, in which the purchasers were interested in acquiring housing rather than making an investment for profit, is not within the scope of the federal securities laws.

Since respondents' claims are not cognizable in federal court, the District Court properly dismissed their complaint.[27]  The judgment below is therefore

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE WHITE join, dissenting.

I dissent.  The property interests here are "securities," in my view, both because they are shares of "stock" and because they are "investment contracts."

## I

Both the Securities Act of 1933, 15 U. S. C. § 77b (1), and the Securities Exchange Act of 1934, 15 U. S. C. § 78c (a)(10), define the term "security" as including, among other things, an "investment contract."  The essential ingredients of an investment contract have been clear since *SEC* v. *W. J. Howey Co.*, 328 U. S. 293, 301 (1946), held that "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."  See *Tcherepnin* v. *Knight*, 389 U. S. 332, 338 (1967).  There is no doubt that Co-op City residents invested money in a common enterprise; the only questions in-

---

[27] Besides the Securities Acts claims, respondents also included a vague and conclusory allegation under 42 U. S. C. § 1983 against petitioner New York State Housing Finance Agency.  We agree with the District Court that this count must also be dismissed.  See n. 9, *supra*.  The remaining counts in the complaint were all predicated on alleged violations of state law not independently cognizable in federal court.

volve whether the investment was to be productive of "profits to come solely from the efforts of others."

The record discloses little of the activities of Riverbay Corporation, the owner and operator of Co-op City, as a lessor of commercial and office space. It does appear, however, that revenues well in excess of $1 million per year flow into the corporation from such activities, Appendix in Court of Appeals 361a (hereafter App.), a fact noted by the Court of Appeals. 500 F. 2d 1246, 1254 (CA2 1974). Even after deduction of expenses—taxes alone take half of the gross—the residue could hardly be *de minimis,* even for an operation as large as Co-op City. Therein lies the patent fallacy of the Court's conclusion that this aspect of the corporation's activities is "speculative and insubstantial." *Ante,* at 856. The District Court rightly recognized that management by third parties is essential in a project so massive as Co-op City. 366 F. Supp. 1117, 1128 (SDNY 1973). Co-op City residents as stockholders were thus necessarily bound to rely on the management of Riverbay Corporation to produce income in the form of rents from the commercial and office space made an integral part of the project.

As stockholders, Co-op City residents also necessarily relied on corporate management to build and operate the facility efficiently to the end that monthly charges would be minimized. The Court of Appeals held that profits were involved partly because Co-op City offered housing at bargain prices. 500 F. 2d, at 1254. The Court substitutes its own judgment in holding that "[t]he low rent derives from the substantial financial subsidies provided by the State of New York." *Ante,* at 855. It is simple common sense that management efficiency necessarily enters into the equation in the determination of the charges assessed against residents. But even to the extent that the resident-stockholders do benefit in re-

duced charges from government subsidies, the benefit is not for this reason any the less a profit to them. The welfare benefits to which the Court refers, *ante,* at 855, may also be profits, but those profits lack the essential ingredient of profits present here that "come solely from the efforts of others." Here the resident investors utilize the efforts of others to obtain government subsidies. Investors in Wall Street who do this every day will be surprised to learn that the benefits so obtained are not considered profits.

The Court of Appeals also relied on the tax deductibility accorded to portions of the monthly carrying charges paid by Co-op City residents as a source of profit to them. 500 F. 2d, at 1254. The Court rejects this argument with the statement that "[t]hese tax benefits are nothing more than that which is available to any homeowner . . . ." *Ante,* at 855. This is true but irrelevant to the question whether they constitute profits that "come solely from the efforts of others." The special federal tax provision for cooperative owners, 26 U. S. C. § 216, was intended "to place the tenant stockholders of a cooperative apartment in the same position as the owner of a dwelling house so far as deductions for interest and taxes are concerned." S. Rep. No. 1631, 77th Cong., 2d Sess., 51 (1942). This tax benefit constitutes a profit both for the individual homeowners and for the "tenant stockholders of a cooperative apartment." The difference is that the profit of the individual homeowner does not "come solely from the efforts of others," whereas the profit from this source realized by a resident of Co-op City does. Setting up and operating a corporation so as to take advantage of special tax provisions is a project requiring specialized skills. If the arrangements go awry the residents can find themselves without the hoped-for tax advantages.

See, *e. g.*, *Eckstein* v. *United States,* 196 Ct. Cl. 644, 452 F. 2d 1036 (1971). Thus, the investors must depend upon the "efforts of others," here Co-op City's management, properly to organize and operate the project to realize the tax advantage for them.

In *SEC* v. *C. M. Joiner Leasing Corp.,* 320 U. S. 344 (1943), the investment was in oil leases. In *Howey* it involved citrus groves. Though taxation was not a factor in the Court's disposition of those cases, each of those investments was of a type offering tax advantages as a principal attraction to the investor. Cunnane, Tax Shelter Investments After the 1969 Tax Reform Act, 49 Taxes 450 (1971). It is no answer that the individual investor could have obtained the same tax advantages by purchasing an entire citrus business or by becoming an independent oil operator. He could, but if he did his profits from tax advantages would not then "come solely from the efforts of others." It is only when he relies on third parties to produce the profits for him that, as here, the question of investment contract analysis arises.

Besides its express rejection of each of the forms of profit found by the Court of Appeals, the Court must surprise knowledgeable economists with its proposition, *ante,* at 852, that profits cannot assume forms other than appreciation of capital or participation in earnings.[1] All of the varieties of profit involved here accrue to the resident-stockholders in the form of money saved rather than money earned.[2] Not only would simple common sense teach that the two are the same, but a more sophisticated economic analysis also compels the conclusion that in a practical world there is no difference between

[1] See P. Samuelson, Economics 618–626 (9th ed. 1973).

[2] Apparently there is at least a possibility that dividends could be paid to shareholders, but these would really just be partial refunds of money already paid in which was not needed.

the two forms of income.[3]   The investor finds no reason
to distinguish, for example, between tax savings and
after-tax income.   Under a statute having as one of its
"central purposes" "to protect investors," *Tcherepnin,*
389 U. S., at 336, it is obvious that the Court errs
in distinguishing among types of economic inducements
which have no bearing on the motives of investors.
Construction of the statute in terms of economic reality
is more faithful to its "central" purpose "to protect
investors."

There can be no doubt that one of the inducements
to the resident-stockholders to purchase a Co-op City
apartment was the prospect of profits in one or more of
the forms I have discussed.   The fact that literature
encouraging purchase mentioned some is important,
although not conclusive, evidence.   See *Joiner, supra,*
at 353.   The Information Bulletins, while not mention-
ing income from commercial and office space as an ad-
vantage of stock ownership, did emphasize the "reason-
able price" of the housing, App. 166a, 187a, and they as-
serted that "every effort" would be made to keep monthly
carrying charges low, *id.,* at 174a, 194a.   Tax benefits
were also discussed as an advantage of ownership, though
of course no guarantee of favorable federal and state tax
treatment was made.   *Id.,* at 175a, 195a.

I do not deny that there are some limits to the broad
statutory definition of a security, and the Court's dis-
tinction between securities and consumer goods is not
frivolous.   *Ante,* at 858.   But the distinction is not use-
ful in the resolution of the question before us.   Of course,
the purchase of the stock to get an apartment involves
an element of consumption, but it also involves an ele-
ment of investment.   The variable annuity contract con-

---

[3] See, *e. g.,* P. Samuelson, *supra,* n. 1, at 435; Coase, The Problem
of Social Cost, 3 J. Law & Econ. 1 (1960).

sidered in *SEC* v. *Variable Annuity Co.*, 359 U. S. 65 (1959), presented a not irrelevant analogous situation. What was purchased, after all, was expressly labeled "stock." In any event, what was purchased constituted an "investment contract," within *Howey*, for resident-stockholders of Co-op City invested "in a common enterprise with profits to come solely from the efforts of others." They therefore were purchasing securities within the purview of the Securities Act of 1933 and the Securities Exchange Act of 1934.

## II

Moreover, both statutes define the term "security" to include "stock." Therefore, coverage under the statutes is clear under the Court's holding in *Joiner* that "[i]nstruments may be included within any of these definitions, as matter of law if on their face they answer to the name or description." 320 U. S., at 351; see *Tcherepnin*, 389 U. S., at 339. "Security" was broadly defined with the explicit object of including "the many types of instruments that in our commercial world fall within the ordinary concept of a security," H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933). Stock is therefore included because instruments "such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning." *Joiner*, 320 U. S., at 351. Even if this principle nevertheless allows room for exception of some instruments labeled "stock," the Court's justification for excepting the stock involved in this case is singularly unpersuasive. The Court states that "[c]ommon sense suggests that people who intend to acquire only a residential apartment in a state-subsidized cooperative, for their personal use, are not likely to believe that in reality they are purchasing investment securities simply because the transaction is

evidenced by something called a share of stock." *Ante,* at 851. But even informed commentators have expressed misgivings about this question.[4] Thus the Court's justification departs unacceptably from the principle of *Joiner* that "[i]n the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." 320 U. S., at 353.

While the absence in the case of Co-op City stock of some features normally associated with stock is a relevant consideration, the presence of the attributes that led me to conclude that this stock constitutes an "investment contract," leads me also to conclude that it is a "stock" for purposes of the two statutes. Cf. *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128 (1972).

In sum, I conclude that the interests purchased by the stockholders here were "securities" both because they were "stock" and because they were "investment contracts."[5] In my view therefore the Court of Appeals correctly held that the District Court erred in dismissing this suit.[6]

---

[4] See, *e. g.,* 1 L. Loss, Securities Regulation 492–493 (2d ed. 1961).

[5] Accordingly, I have no occasion to examine the "risk capital" approach of *Silver Hills Country Club* v. *Sobieski,* 55 Cal. 2d 811, 361 P. 2d 906 (1961), to determine whether that would lead to the same result.

[6] Petitioners in No. 74–647, the State of New York and the New York State Housing Finance Agency, argue that respondents' suit against them is barred by the Eleventh Amendment. The Court finds it unnecessary to deal with this contention, but my conclusion requires that I answer the Eleventh Amendment defense. The Court of Appeals found no Eleventh Amendment bar here, and I am in agreement with this result.

The Housing Finance Agency is a "public benefit corporation" under New York law, N. Y. Priv. Hous. Fin. Law § 43 (1) (1962 and Supp. 1974–1975), empowered "[t]o sue and be sued," § 44 (1). The agency is authorized to accept funds from the State, the Fed-

## III

At oral argument, petitioner United Housing Foundation contended strenuously that comprehensive state participation and regulation of the construction and operation of Co-op City constituted Riverbay Corporation not a capitalistic enterprise but a beneficial public housing enterprise, created by a partnership of public and private groups for the benefit of people of modest incomes. I need not disagree with this characterization to conclude that nevertheless there is a role for the fed-

---

eral Government, or "any other source," § 44 (16), but it also is empowered to issue notes, bonds, or other obligations to obtain financing, §§ 44 (7) and 46. Significantly, the State is not liable on the agency's notes or bonds, and such obligations do not constitute debts of the State. § 46 (8). The agency is therefore not an "alter ego" of the State; rather it is an independent body not entitled to assert the Eleventh Amendment. See *Cowles* v. *Mercer County*, 7 Wall. 118 (1869); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 690 (2d ed. 1973). Compare *Matherson* v. *Long Island State Park Comm'n*, 442 F. 2d 566 (CA2 1971), and *Zeidner* v. *Wulforst*, 197 F. Supp. 23, 25 (EDNY 1961), with *Whitten* v. *State University Construction Fund*, 493 F. 2d 177 (CA1 1974), and *Charles Simkin & Sons, Inc.* v. *State University Construction Fund*, 352 F. Supp. 177 (SDNY), aff'd mem., 486 F. 2d 1393 (CA2 1973).

The State of New York, unlike the agency, may assert the Eleventh Amendment, but it has consented to suit. "With regard to duties and liabilities arising out of this article the state, the commissioner or the supervising agency may be sued *in the same manner as a private person*." N. Y. Priv. Hous. Fin. Law § 32 (5) (emphasis added). To be sure, state waiver statutes are to be strictly construed, and they do not necessarily indicate consent to suit in federal court. See *Kennecott Copper Corp.* v. *State Tax Comm'n*, 327 U. S. 573 (1946); *Ford Motor Co.* v. *Department of Treasury*, 323 U. S. 459 (1945); *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47 (1944). Nevertheless, the language used in § 32 (5) is in my view sufficiently broad to permit suit in both state and federal courts.

eral statutes to play in avoiding the danger of fraud and other evils in the raising of the massive sums the project involved. See *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180, 195 (1963); H. R. Rep. No. 85, 73d Cong., 1st Sess., 2–3 (1933). No doubt New York's intensive regulation also helps avoid those evils. See N. Y. Priv. Hous. Fin. Law. But Congress contemplated concurrent state and federal regulation in enacting the securities laws. *SEC* v. *Variable Annuity Co.,* 359 U. S., at 75 (concurring opinion), and therefore the existence of state regulation does not and cannot be a reason for excluding appropriate application of the federal statutes. Indeed, the resident-stockholder investors of Co-op City are particularly entitled to the federal protection. The District Court properly observed:

> "[I]f ever there was a group of people who need and deserve full and careful disclosure in connection with proposals for the use of their funds, it is this type of group. . . . The housing selection decision is a critical one in their lives. The cost of housing demands a good percentage of their incomes. Their savings are most likely to be minimal, and they probably don't have lawyers or accountants to guide them. Further, they are people likely to put a great deal of credence in statements made with respect to an offering by reputable civic groups and labor unions, particularly when the proposal is stamped with the imprimatur of the state." 366 F. Supp., at 1125.

I part from the District Court in concluding however that investors not only *should be* protected but, under my reading of the statutes, *are* protected by the securities laws. A different, perhaps better, form of redress can and will be devised for this kind of investment, but until it is these investors are not to be denied what the

federal statutes plainly allow them. See Note, Cooperative Housing Corporations and the Federal Securities Laws, 71 Col. L. Rev. 118 (1971). The SEC, though perhaps tardily, has come to the view that these housing corporations fall within its regulatory authority because the kind of investment involved is a "security" under the statutes. I wholly agree. I would affirm the judgment of the Court of Appeals.