FILED
United States Court of Appeals
Tenth Circuit

August 2, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSEPH ANGELO SIVIGLIANO,

Defendant-Appellant.

No. 12-6247
(D.C. No. 5:11-CR-00319-R-1)
(W.D. Okla.)

**ORDER AND JUDGMENT***

Before **TYMKOVICH**, **ANDERSON**, and **MATHESON**, Circuit Judges.

Defendant Joseph Angelo Sivigliano was convicted of conspiracy to commit

wire fraud and securities fraud, as well as numerous counts of wire fraud and money

laundering, all of which arose out of a Ponzi scheme he managed involving a real

estate flipping operation that promised a very lucrative monthly rate of return to

investors. He now appeals, contending that the government's proof was legally

---

* After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

insufficient in certain respects.[1]  On de novo review, *United States v. Baker*, 713 F.3d 558, 562 (10th Cir. 2013), we affirm for the reasons stated below.

## FACTUAL BACKGROUND

A broad summary of the government's case against Mr. Sivigliano will put his particularized appellate contentions in focus.  Of course we consider the evidence in a light most favorable to the government.  *United States v. MacKay*, 715 F.3d 807, 812 (10th Cir. 2013).  The case against Mr. Sivigliano was presented primarily through his co-conspirators, Dwight Pimson and Venus Smith,[2] several defrauded investors, and FBI agent Ron Carver.  The defense presented no witnesses.

The investment scheme was operated through Helping Hearts and Hands, Inc. (HHH), a previously dormant 26 U.S.C. § 501(c)(3) charitable corporation provided for Mr. Sivigliano's use by Mr. Pimson, who served as his right-hand man.  The government's case focused on the primary investment program HHH offered:  clients invested funds in $10,000 increments that HHH was to use in purchasing foreclosed properties in Oklahoma City that would promptly be brought up to resale condition and sold at a profit, providing proceeds from which investors whose funds had been

---

[1]     In his summary of argument, Mr. Sivigliano also states, in passing and without elaboration, "that his Sixth Amendment confrontation clause rights were violated." Opening Br. at 14.  But the point is never argued in his brief, so we do not consider it.  *See, e.g.*, *LaFevers v. Gibson*, 182 F.3d 705, 725 (10th Cir. 1999); *Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992).

[2]     Both Mr. Pimson and Ms. Smith pleaded guilty to conspiracy in connection with the scheme.

used (singly or in combination with others') to buy property were to be paid a five percent return each month. Investors received documents reflecting their investments and the properties purportedly securing them. In fact, however, the documents were not recorded, so they provided no security. Moreover, the properties were at times worth less than the (sometimes multiple) investments purportedly secured, and in some instances HHH did not even own the designated property.

Initially, this program was offered to investors in Oklahoma, but in late 2006 and early 2007 HHH began marketing to a wider audience through investment seminars in California. Records for 2006-2007 showed participation by more than 65 investors, with some $3.8 million invested. As agent Carver explained, these records also showed that, contrary to what investors were told, their money was actually being used, at least in part, to cover other investors' returns, in classic Ponzi fashion. This point was made as well in testimony from Venus Smith, who as secretary to Mr. Sivigliano provided investors with the documentation for their investments. The same records and testimony showed that investment money was also misdirected to pay personal expenses and fund collateral business ventures of Mr. Sivigliano and his co-conspirators.

The scheme collapsed in the summer of 2007, resulting in extensive losses for HHH investors. Upon his conviction, Mr. Sivigliano was ordered to pay $2,214,522 in restitution to his victims.

**CONTENTIONS ON APPEAL**

Mr. Sivigliano contends that the government failed to offer sufficient evidence to prove (1) an intent to defraud investors; (2) an agreement to commit wire and securities fraud for the conspiracy count; and (3) the offering and sale of securities for the conspiracy and money laundering counts (the latter require use of proceeds from unlawful activity, here identified as securities fraud).[3] He also generally contends that the commingling of funds in HHH accounts left the government without definitive proof of particular funds being used for particular transactions. In addressing these contentions we consider the direct and circumstantial evidence, along with all reasonable inferences therefrom, in a light most favorable to the government, deferring to the jury's determination of guilt unless "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012) (internal quotation marks omitted).

### A. Proof of Fraudulent Intent

The evidence of intent to defraud was undeniable. Indeed, some of it came from Mr. Sivigliano himself. He admitted to agent Carter in an interview that he told investors their money would be used only to purchase properties pursuant to the

---

[3] In his opening brief Mr. Sivigliano also contended that the government did not prove that the purported securities were required to be registered under Oklahoma law. We agree with the government that, as failure to register was not a separately charged offense or an element of any of the offenses charged, registration *vel non* is immaterial to Mr. Sivigliano's convictions.

investment program outlined above, when in fact he was using it for other purposes as noted above, including simply covering returns owed to other investors. He was even using their money to fund strawman purchases (particularly by Ms. Smith) of the very properties that HHH was purportedly selling to third parties to generate investor returns. Intent to defraud may be inferred from misrepresentations, attempts to conceal activity, and conversion of money for the defendant's own use. *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003). Here the jury could easily infer an intent to defraud investors.[4]

## B. Proof of Agreement

The record also contains sufficient evidence from which a jury could properly infer the existence of the agreement necessary for conspiracy. *See United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (noting conspiracy conviction may be based on "circumstantial evidence indicating coordination and concert of action"). Mr. Pimson and Ms. Smith (ostensibly married at the time[5]) both played substantial supporting roles in the HHH operation, all at Mr. Sivigliano's direction (and, of course, both admitted to the jury that they had pleaded guilty to participating in the

---

[4] Mr. Sivigliano insists he did not, in any event, start out with the intent to defraud investors. Not surprisingly, he cites no authority for his tacit premise that an illegal conspiracy or enterprise is excused if it only turned to fraud because of the failure of an originally legal business model. We decline to adopt that facially untenable proposition.

[5] They held themselves out as man and wife, though Ms. Smith (then using the name "Venus Pimson") was still married to someone else.

conspiracy).  Mr. Pimson met with potential investors and showed them properties. Ms. Smith prepared and sent documentation to investors and served as their initial point of contact by phone and email.  In addition to such day-to-day activities, they attended the California investment seminars with Mr. Sivigliano and helped him recruit new investors there.  And Ms. Smith, at least, acknowledged that she knew investor funds were not being used in the manner that Mr. Sivigliano represented to investors.  This was an ample showing of coordination and concert of action on which to find conspiratorial agreement.

## C. Proof of Sale of Securities

There was also a sufficient basis to find that the investments HHH sold were securities.  Mr. Sivigliano contends the investments were nothing more than ordinary real estate transactions, which are not treated as securities because the purchaser obtains something of inherent value—land to develop, a home to reside in, a building to occupy—rather than just an entrepreneurial promise of a return on investment, *see United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (distinguishing ordinary real estate transactions from investment contracts qualifying as securities); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) (same). This characterization of the investment program is simply not borne out by the facts. As noted earlier, the properties identified in the HHH documentation did not even serve as security for, much less the end purpose of, participants' investments; rather, investors participated for the lucrative monthly returns Mr. Sivigliano promised them

in return for the use of their money. The real estate purchases characterized as non-securities in *Forman* were exactly the opposite: "investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments." *Forman*, 421 U.S. at 853.

We have carefully reviewed the trial record in light of the various contentions advanced by the parties on appeal. We conclude there was ample evidence to support the jury's determination that the relevant investments constituted securities.[6]

## D. Commingling/Tracing Objection

Finally, Mr. Sivigliano repeatedly voices the general objection that the HHH accounts involved in the charged offenses contained at least some funds from legal activities and that the government failed to offer definitive evidence tracing funds derived from illegal activities to their subsequent use by him or HHH. This objection is irrelevant to the wire fraud counts. These were complete when, as charged in the indictment, the victims wired their funds *into* the accounts. *See United States v. Kennedy*, 707 F.3d 558, 566 (5th Cir.) (where indictment charges wire fraud based on fraudulently induced transfer of funds, it "is a consummated crime when the illicitly obtained funds are transmitted"), *cert. denied*, Nos. 12-9922 & 12-10100, 2013 WL 1787794 & 2013 WL 1858225 (U.S. June 3, 2013); *see also United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992) (wire fraud offense incomplete until

---

[6] We note that the theory on which the case was tried and the jury reached its verdict was framed by instructions agreed upon by the parties and given without objection, either at trial or on appeal.

- 7 -

fraudulently elicited funds are transmitted to defendant). It is obviously also irrelevant to the conspiracy count, which was satisfied by proof of agreement and any act in furtherance thereof (for which any of the conspirators' acts prompting investors to transfer funds into the HHH account sufficed).

That leaves the money laundering counts, which did require a further financial transaction involving illegally derived proceeds held in HHH accounts (i.e., some use of the funds obtained as a result of the securities fraud practiced on investors). *See* 18 U.S.C. §§ 1956(a)(1)(A)(i) (requiring "financial transaction" involving "proceeds of specified unlawful activity"), 1957(a) (requiring a "monetary transaction" in property "derived from specified unlawful activity"). But in this circuit (as in some others), when legal and illegal funds are commingled in an account from which transfers are made, the government is not required to trace particular illegal funds to particular transfers to prove the use-of-unlawful-proceeds element of money laundering. *See Dazey*, 403 F.3d at 1163 (following *Johnson*, 971 F.2d at 570, to hold that "[t]he government need not meticulously trace the funds involved in a monetary transaction offense or prove that the funds could not have come from a legitimate source"); *accord United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) (holding "the government must only prove that the tainted proceeds were commingled with other funds" in account from which money laundering transactions were made). As we explained in *Johnson*, "allow[ing] individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime . . .

- 8 -

would defeat the very purpose of the money-laundering statutes." *Johnson*, 971 F.2d at 570 (citing *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991) (making same point)); *see Ward*, 197 F.3d at 1083 ("Congress did not intend for participants in unlawful activities to escape conviction for money laundering simply by commingling funds derived from both specified unlawful activities and other activities. Commingling of funds is itself suggestive of a design to hide the source of ill-gotten gains[.]" (internal quotation marks omitted)). Here the government offered proof that for the time period in question, HHH and Mr. Sivigliano received over $3.8 million in fraudulently obtained funds from investors and that, on average, some eighty-seven percent of the money in HHH accounts derived from this activity. That was ample proof of illegally derived funds to support the money laundering counts.

The judgment of the district court is affirmed.

Entered for the Court

Stephen H. Anderson
Circuit Judge