James A. ALEXY and Betty Jean Alexy, his wife

v.

KENNEDY HOUSE, INC.

Civ. A. No. 78–967.

United States District Court, E. D. Pennsylvania.

Feb. 4, 1981.

Stephen R. Bolden, Philadelphia, Pa., for plaintiffs.

Walter W. Rabin, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHAPIRO, District Judge.

The issue is whether the By-Laws of a non-profit cooperative apartment house, insured by the Federal Housing Administration under the National Housing Act, are rendered an illegal restraint on alienation by the impact of inflation. The cooperative members, if terminating their occupancy, are required to transfer their membership shares at a price formula agreed upon when they acquired their occupancy rights. It is alleged that the agreed transfer price is confiscatory, illegal and unenforceable because it does not provide for any increase due to inflation during their years in residence. In effect, in this diversity action plaintiffs seek a declaratory judgment that the apartment they lived in as a cooperative must become a condominium in violation of their contract and the wishes of the other members. We find no reason in law or social and economic policy to permit this and enter judgment for defendant on the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiffs, James A. Alexy and Betty Jean Alexy, his wife, are now, and since June of 1977, have been residents of the State of New Jersey, residing at 10 Dunbarton Road, Wexford Lens, Cherry Hill, New Jersey.

2. James A. Alexy is an attorney, admitted to practice in Pennsylvania and New Jersey, an instructor in business law at Drexel University, Rutgers University and the Wharton School of the University of Pennsylvania and describes himself as a real estate practitioner.

3. Defendant is a non-profit corporation, incorporated under the laws of the State of Delaware, which owns and operates a cooperative apartment house located at 1901 John F. Kennedy Boulevard, Philadelphia, Pennsylvania, and named "Kennedy House."

4. Kennedy House is a cooperative housing corporation organized and operated under Section 213 of Title II of the National Housing Act, as amended, and the administrative regulations propounded thereunder. The mortgage on its building is insured by the Federal Housing Administration ("FHA") under Section 213. Under a Regulatory Agreement executed at the time of a construction loan closing, the Federal Housing Commissioner still retains significant controls with respect to the operation of the cooperative:

a) The mortgagor may not execute an instrument which imposes a restriction upon the sale, leasing or occupancy of the property on the basis of race, color or creed. (¶ 10).

b) Kennedy House as mortgagor has also agreed that there shall be full compliance with the provisions of (1) any state or local laws prohibiting discrimination in housing on the basis of race, color, creed or national origin, and (2) with the Regulations of the FHA providing for non-discrimination and equal opportunity housing. (¶ 16).

5. Each of the approximately 650 members of Kennedy House is entitled to occupy an apartment unit in the apartment build-

ing by virtue of such membership and pursuant to the terms of an Occupancy Agreement between the member and Kennedy House (in effect, a lease).

6. The tenant-members of Kennedy House elect a Board of Directors which manages the apartment house with the aid of committees comprised of members, a tenant council and an outside management agent.

7. Maintenance charges are fixed at the beginning of each year, in an amount calculated to cover the expenses of the operation of the building and debt service on the mortgage, and each member pays his proportionate share thereof (the equivalent of rent).

8. On July 11, 1966 plaintiffs, James A. Alexy and his wife Betty Jean, executed a "Subscription Agreement" to entitle them to become members of Kennedy House and to occupy an apartment in Kennedy House, for which they paid a subscription price of $3,292.00.

9. The apartment which this would entitle them to occupy when the apartment was constructed was Apartment 2606, a 2 bedroom, 2 bath apartment on the 26th floor of the building. At the time plaintiffs paid their subscription price to defendant for the membership certificate in question, the apartment had not yet been constructed.

10. Concurrently with the execution of the Subscription Agreement the Alexys were provided by Kennedy House with an "Information Bulletin." Said Information Bulletin explained what a housing cooperative was and how it operated. It also contained copies of the following documents: (1) Kennedy House's Certificate of Incorporation; (2) the Regulatory Agreement between Kennedy House and the Federal Housing Commissioner; (3) the form of Subscription Agreement between Kennedy House and each member; (4) the Cooperative Service Agreement between Kennedy House and Frankel Management, Inc. (the Management Agent for Kennedy House); and (5) the proposed By-Laws of Kennedy House. Plaintiffs also received from Kennedy House a "Supplement to the Information Bulletin," modifying and updating the Information Bulletin.

11. The proposed By-Laws of Kennedy House, which were part of the Information Bulletin plaintiffs received from Kennedy House, were adopted by Kennedy House on March 20, 1967, in precisely the form they appeared in said Information Bulletin. These By-Laws were model By-Laws prepared by the FHA, and FHA approval of the By-Laws was required in order for Kennedy House to qualify for mortgage insurance (and, therefore, mortgage financing) pursuant to Section 213 of the National Housing Act.

12. a) The total cost of constructing the apartment house was $14,120,917.00.

b) The mortgage on this project, insured by the FHA under Section 213 of Title II of the National Housing Act, was in the amount of approximately $12,700,000.00 for a term of forty (40) years or 480 equal monthly installment payments of $63,-513.48, applied first to interest at 5¼% and the balance to principal.

c) The mortgage payments began on March 1, 1969.

d) The ratio of total construction cost ($14,120,917.00) to the amount of the mortgage ($12,700,000.00) in effect created 90% mortgage financing.

e) As initial subscribers for membership, plaintiffs' investment constituted a portion of the working capital used to help finance construction. While waiting from the summer of 1966 until construction was completed in April of 1969, plaintiffs received no interest on their investment of $3,292.00.

13. a) On April 28, 1969 the Alexys and Kennedy House executed an "Occupancy Agreement" which entitled the Alexys to occupy Apartment No. 2606 of Kennedy House, and on that same date Kennedy House issued to the Alexys "Membership Certificate" No. 550. On that same date, April 28, 1969, the Alexys commenced occupancy of Apartment 2606.

b) Article 8 of the Occupancy Agreement executed by the Alexys and Kennedy House on April 28, 1969 provides:

Neither this agreement nor the Member's right of occupancy shall be transferrable or assignable except in the same manner as may now or hereafter be provided for the transfer of memberships in the By-Laws of the Corporation.

14. Article III, Section 8(b) of the By-Laws of Kennedy House, in regard to the procedure when a tenant-member desires to vacate his apartment, provides:

If the member desires to leave the project, he shall notify the Corporation in writing of such intention and the Corporation shall have an option for a period of ninety (90) days thereafter, but not the obligation, to purchase the membership, together with all of the member's rights with respect to the dwelling unit, at an amount to be determined by the Corporation as representing the transfer value thereof, less any amounts due by the member to the Corporation under the Occupancy Agreement, and less the cost or estimated cost of all deferred maintenance, including painting, redecorating, floor finishing, and such repairs and replacements as are deemed necessary by the Corporation to place the dwelling unit in suitable condition for another occupant. The purchase by the Corporation of the membership will immediately terminate the member's rights and the member shall forthwith vacate the premises.

15. "Transfer value," as used in subsection (b) of Article III, Section 8 of the By-laws, is defined in subsection (d) thereof as follows:

Whenever the Board of Directors elects to purchase a membership, the term 'transfer value' shall mean the sum of the following:

(1) The consideration (i. e., down payment) paid for the membership by the first occupant of the unit involved as shown on the books of the Corporation;

(2) The value, as determined by the Directors, of any improvements installed at the expense of the member with the prior approval of the Directors, under a valuation formula which does not provide for reimbursement in an amount in excess of the typical initial cost of the improvements; and

(3) The amount of principal amortized by the Corporation on its mortgage indebtedness and attributable to the dwelling unit involved as paid by the member involved and previous holders of the same membership. However, the amount of principal paid by the Corporation for a period of three (3) years after the Corporation has made its first principal payment on the mortgage shall not be included in this computation.

16. If defendant does not elect to repurchase the departing member's share, then the departing member is given the right under Article III, Section 8(c) of the By-Laws to sell to ". . . any person who has been duly approved by the Corporation as a member and occupant."

17. Although Article III, Section 8(b) of defendant's By-Laws provides it with an option, it always has been defendant's policy to exercise its option and buy back the departing member's membership certificate.

18. The procedure uniformly followed by Kennedy House when a tenant-member desires to vacate and to sell his membership, pursuant to Article III, Section 8 of its By-Laws, has been as follows:

a) The outgoing tenant-member gives Kennedy House written notice of his intention to leave, which gives Kennedy House a 90-day option to purchase his membership.

b) Kennedy House exercises its option to purchase the membership, and pays the outgoing tenant-member the "transfer value" of the apartment, as defined by the By-Laws. The transfer value is essentially what the outgoing tenant-member paid for his membership, plus his pro-rata portion of the principal reduction on Kennedy House's mortgage debt, plus an allowance for permanent improvements made by the tenant-member to his apartment.

c) Kennedy House then resells the membership (and the right to occupy the apartment) to the person at the top of the waiting list for that type of apartment, for the same transfer value paid to the outgoing tenant-member, together with an administrative and a cost of construction charge. The administrative charge is a fixed sum to compensate Kennedy House for the cost of administering the waiting list and the time its personnel spends in connection with the repurchase and resale of apartments. The cost of construction charge is based upon a cost of construction index, which assures that the new purchaser of the apartment will pay in present dollar value the equivalent of the dollar value the original purchaser had paid when he became a member.

d) Beatrice C. Hoffman, a member of the Board of Directors, was Chairman of the Membership Committee. The court credits her testimony that:

> For the time period pertinent hereto applicants who made a deposit of $95 were placed on the waiting list in chronological order of application on ledger sheets which also note apartments shown to each applicant. When an applicant reaches the top of the waiting list for a particular type of apartment, the applicant is offered an apartment two times; if neither apartment is accepted, the deposit is returned and name removed from the list. If the apartment is acceptable to the applicant, there is an interview by the membership committee for recommendation to the Board. In the history of Kennedy House, there have been only three instances where individual applicants have not been recommended to the Board by the Membership Committee, for a variety of reasons (related to ability to pay) which were explained to each such applicant. There is close monitoring of the application list and, to her knowledge, there has been no occasion when an applicant was taken out of turn.

19. The difference between the sum paid by Kennedy House to the outgoing member and the sum received by Kennedy House from the new member (which is the administrative and cost of construction charge) becomes part of the operating funds of Kennedy House, and has the effect of enabling Kennedy House to minimize the carrying charges paid by the members occupying Kennedy House.

20. The administrative and cost of construction charges which Kennedy House receives from new members have been reported to the FHA, which annually reviews Kennedy House's financial statements, and the FHA has never questioned the propriety of these charges.

21. By letter dated July 1, 1977, plaintiff, James A. Alexy, wrote to Louis Wilderman, President of defendant's Board of Directors, advising him that plaintiffs were vacating the building effective July 1, 1977. In this letter, Mr. Alexy made alternative proposals with respect to the disposition of plaintiffs' membership certificate.

22. a) Plaintiffs' first proposal was to sell their membership certificate to defendant for the sum of all monies which they were entitled to under the existing By-Law, Article III, Section 8(d), plus the construction cost factor utilized by defendant in all of its resales following acquisition of a departing member's share.

b) The second alternative proposal was to pay to defendant all monies which defendant would have received had it exercised its purchase option under Article III, Section 8(b) and then resold the share to a prospective member on the waiting list. Under this proposal, plaintiffs agreed that defendant should have final approval of any purchaser selected by plaintiffs. Finally, in return for this, plaintiffs requested that defendant waive on behalf of plaintiffs and the purchaser selected by plaintiffs, defendant's right of first refusal under Article III, Section 8(b).

23. The transfer value for which the Alexys offered to sell their membership to Kennedy House in their offer of July 1, 1977 was based upon a formula different from that which is set forth in subsection

(d) of Article III, Section 8 of Kennedy House's By-Laws. The alternative offer set forth by the Alexys in their July 1, 1977 letter to Kennedy House was also at variance with the procedures set forth in the Kennedy House By-Laws.

24. On July 22, 1977 Kennedy House sent the Alexys a written reply to their offer of July 1, 1977. Kennedy House would not accept the Alexys' offer which was at variance with the procedures prescribed in the Kennedy House By-Laws, and Kennedy House insisted that the By-Laws procedure be followed.

25. The Alexys' letter to Kennedy House of July 1, 1977 referred to possible "protracted, expensive and publicized litigation" if Kennedy House did not accept the Alexys' offer, and also sought to distinguish the facts of the Alexys' situation from those of a case which had previously been litigated between a former Kennedy House member and Kennedy House. That prior case was *Broker v. Kennedy House*, May Term, 1974, No. 2715 (C.P.Phila., August 9, 1976), and was decided by Judge Calvin I. Wilson in favor of Kennedy House and against the plaintiffs therein.

26. Article VIII of the By-Laws of Kennedy House provides the methods for amending the By-Laws:

These By-Laws may be amended by the affirmative vote of the majority of the entire regular membership of record at any regular or special meeting, provided that no amendment shall become effective unless and until it has received the written approval of the Administration. Amendments may be proposed by the Board of Directors or by petition signed by at least twenty (20) per cent of the members. A description of any proposed amendment shall accompany the notice of any regular or special meeting at which such proposed amendment is to be voted upon.

27. Subsections (b) and (d) of Article III, Section 8 of the By-Laws (which set forth the procedures when a tenant-member elects to vacate and define "transfer value") have not been amended since the By-Laws were first adopted, and no amendment thereto has ever been proposed to the membership, either by the Board of Directors or by a petition of the members.

28. In 1970 the FHA's model form of By-Laws was changed in the following respect: Although the definition of "transfer value" as set forth in the FHA's original model By-Laws, (adopted by Kennedy House) was not changed, a footnote was added that:

If desired, a provision may be added to the effect that the transfer value otherwise applicable may be increased and decreased pursuant to fluctuations in the economy as evidenced by a Cost of Living Index. The language of such provision must be cleared with the FHA.

29. a) James A. Alexy while a member of Kennedy House talked informally to various members of the Board of Directors in support of such a change in Article III, Section 8 of the By-Laws but never proposed an amendment to the Board of Directors orally, by letter, or by petition with other members.

b) James A. Alexy ran for election to the Board of Directors about 1975 on a platform proposing the amendment of Article III, Section 8 of the By-Laws and he was resoundingly defeated.

c) The Alexys have not agreed to sell their membership in accordance with the By-Law provisions, but instead have brought this action seeking a declaratory judgment that the By-Law provisions and the procedures followed by Kennedy House pursuant thereto are invalid and unenforceable against them.

30. The Alexys vacated Apartment 2606 at Kennedy House on or about June 1, 1977 and removed their furniture without advising Kennedy House they were doing so. The apartment has been vacant since said date and the Alexys have continued to pay the carrying charges for said apartment.[1]

---

1. On September 16, 1980 the parties stipulated that plaintiffs would not be required to pay

carrying charges each month on Apartment

31. The Alexys have advised Kennedy House that they wish to sublet their apartment and Kennedy House has advised them that the policy of Kennedy House with respect to subletting is that:

a) An apartment cannot be sublet for a period in excess of one year.

b) The apartment must be sublet as furnished.

c) Kennedy House is entitled to a subletting fee equal to one month's rent; an apartment sublet is subject to FHA approval and such fee is payable upon execution of the FHA forms and approval by the FHA (Ex. D–1).

32. This subletting policy was adopted by the Board of Directors of Kennedy House and has been applied uniformly by Kennedy House.

33. Article 5 of the Occupancy Agreement, executed by the Alexys and Kennedy House on April 28, 1969, provides, *inter alia* :

The Member shall occupy the dwelling unit covered by this agreement as a private dwelling for himself or for himself and his immediate family, and for no other purpose, and may enjoy the use, in common with the other members of the Corporation, of all community property and facilities of the project (subject to lease arrangements and fees or charges with regard thereto, as in the case of the swimming pool, garage, etc.), so long as he continues to own a membership of the Corporation, occupies his dwelling unit, and abides by the terms of this agreement. Any sublessee of the Member, if approved pursuant to Article 7 hereof, may enjoy the rights to which the Member is entitled under this Article 5.

34. Article 7 of the Occupancy Agreement executed by the Alexys and Kennedy House on April 28, 1969 provides:

The Member hereby agrees not to assign this agreement nor to sublet his dwelling unit without the written consent of the Corporation on a form approved by the Federal Housing Administration. The li-

ability of the Member under this Occupancy Agreement shall continue notwithstanding the fact that he may have sublet the dwelling unit with the approval of the Corporation and the Member shall be responsible to the Corporation for the conduct of his sublessee. Any unauthorized subleasing shall, at the option of the Corporation, result in the termination and forfeiture of the member's rights under this Occupancy Agreement.

35. Plaintiffs advertised in The Philadelphia Inquirer, and with the Naval Base Governmental Housing Office for short-term rentals and the University of Pennsylvania Housing Office in an effort to sublet their apartment subject to the restrictions in question.

36. The Alexys have not obtained a subtenant for their unfurnished apartment in compliance with the Kennedy House rules regarding subleasing.

37. When plaintiffs purchased their membership certificate in defendant's cooperative, the actual value of Apartment 2606 if it were freely transferable as a condominium unit in a condominium apartment building would have been approximately $32,292.00.

38. At the time plaintiffs wanted to vacate Apartment 2606 in July of 1977, if it could have been transferred without restriction as a condominium unit, it would have had a total market value of $65,242.00, which after deduction for mortgage outstanding with respect to the unit in question, would have been a net equitable value of approximately $38,117.00 before allowance for improvements. At the time of trial, the net equitable value of this unit, if it could have been transferred without restriction as a condominium unit, after deduction of the outstanding mortgage balance attributable to the unit, would have been $48,900.00 before allowance for improvements.

2606 but that said carrying charges would be deducted from the transfer value set forth in

Article III, Section 8 of the By-Laws, calculated as of the date the litigation is terminated.

## DISCUSSION

The cooperative ownership plan is a unique form of property ownership, one whose hybrid qualities should be recognized. The concept is *sui generis*. It is a vehicle for the common ownership of property which enables the occupants, the stockholders of the cooperative, to own, manage and operate residential apartments without anyone's profiting therefrom. The contract between the cooperative and cooperator is generally comprised of several components: the corporate charter, by-laws, and the shares of stock, representing the shareholder-cooperator's equity in the corporation, the purchase of which entitles the cooperator to an occupancy agreement. The several components, read together, define the "cooperative interest," or that bundle of rights, privileges, and obligations that determine the relationship between the parties thereto. *Earl W. Jimerson Housing Co., Inc. v. Butler*, N.Y.City Civ.Ct., 412 N.Y.S.2d 560, 562–563, *rev'd. on other grounds*, N.Y.Sup., 425 N.Y.S.2d 925 (1979).

Cooperators are concerned with establishing a community of homes and approach the purchase of a cooperative apartment with a great deal more thought than they would a rental unit '[I]n a very real sense, the tenant stockholders enter into a relation not unlike a partnership though expressed in corporate form.' *Penthouse Properties Inc. v. 1158 Fifth Avenue*, 256 App.Div. 685, 11 N.Y.S.2d 417.

*Id.*, at 563.

It is conceded that Mr. and Mrs. Alexy subscribed for membership in Kennedy House with full knowledge of, and in fact stated specifically that they ratified, "the provisions contained in the certificate of Incorporation, By-Laws, Information Bulletin, Regulatory Agreement, Cooperative Agency Agreement, and Occupancy Agreement," copies of which were attached to the Subscription Agreement and the receipt of which they expressly acknowledged. (Ex. P–1, ¶ 2). Article 8 of the Occupancy Agreement, executed by the Alexys on commencing occupancy, provided that the member's right of occupancy was not transferable or assignable except in the manner provided for in the By-Laws.

Article III, Section 8 of the By-Laws provides that if a member desires to leave, the cooperative has an option to repurchase the membership at an amount to be determined by the cooperative as the "transfer value," an amount related to the consideration originally paid (adjusted by proportional credit for improvements and the mortgage amortization attributed to the dwelling unit occupied by the member).

Plaintiffs claim that the cooperative's pre-emptive right of first refusal, at the transfer value defined in Article III, Section 8 of the Kennedy House By-Laws, constitutes an unlawful restraint on alienation. First, the transfer value formula is alleged to be unreasonable in light of current economic reality because it fails to recognize inflationary and real increases in value and thus precludes an outgoing shareholder from realizing any approximation of the fair market value of his interest. Plaintiffs also contend that the transfer formula bears no rational relationship to the legitimate social and economic objectives which courts generally rely on to validate restraints on alienation of interests in cooperative apartments; furthermore, the benefits to the cooperative are alleged to be insignificant in comparison to the oppressive burden placed on the outgoing member in view of current inflation. A waste of shareholder assets is also alleged.

We find the transfer value formula is reasonable. The transfer value formula effectuates the policy underlying the National Housing Act. The purpose of this Act was not to create investment opportunities but to make housing available to prospective homeowners at moderate prices. *See*, "Federal Assistance in Financing Middle-Income Cooperative Apartments," 68 Yale L.J. 542, 545 (1959). The legislative history demonstrates a congressional preference for cooperatives whose member shareholders were occupants, not investors. *See*, 1957 *U.S.Code Cong. & Adm.News*, 1319, 1322–23. To effectuate this preference for home-

seekers, Section 213 eliminated the individual homeowner's traditional privilege of profiting on the sale of his dwelling. 68 Yale L.J. at 610.

This cooperative housing is subject to federal regulation under Title II, Section 213 of the National Housing Act, 12 U.S.C. § 1715e in order to qualify for Federal Cooperative Housing Mortgage Insurance in accordance with 24 C.F.R. § 213.1 *et seq.* No federal law or regulation requires a cooperative to adjust for inflation when a shareholder is selling his interest, although the FHA undoubtedly would have the authority to make such a provision. The formula in the Kennedy House By-Laws is that of the Model Form of By-Laws written by the FHA (Exhibit P–10). In 1970, four years after plaintiffs acquired their interest, the FHA added a footnote to Article III, Section 8 of its model by-laws:

> If desired, a provision *may* be added to the effect that the transfer value otherwise applicable may be increased and decreased pursuant to fluctuations in the economy as evidenced by a Cost of Living Index or a Construction Cost Index. The language of such provision must be cleared with the FHA. (Emphasis added) (Exhibit P–10, p. 5).

The language clearly indicates that such a provision is discretionary with the cooperative.

After the FHA made inflationary adjustments permissible, James A. Alexy campaigned for such a change with individual members of the Kennedy House Board but was unsuccessful in having the change proposed to the Board. He ran for election on a platform proposing such a change in the By-Laws but was defeated. The members of Kennedy House evidently wish to retain this restraint on transfer which every member accepts as a condition of membership.

The Supreme Court has discussed the non-speculative nature of nonprofit cooperative housing and held that shares in such cooperatives do not constitute "securities" under the federal securities laws. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In reaching this conclusion, the Court assumed the validity of a cooperative's right of first refusal similar to the one involved in the instant case. The court noted that this restriction prevented a shareholder from reselling the apartment at a profit and that this provision effectively insured that no apartment could be sold for more than its original cost. The Court concluded that profit traditionally associated with securities was not offered to shareholders of cooperatives.

> In the present case there can be no doubt that investors were attracted solely at the prospect of acquiring a place to live, and not by the financial returns on their investments.

421 U.S. at 853, 95 S.Ct. at 2061, 44 L.Ed.2d at 633.

A cooperative was recognized as a nonprofit enterprise owned by its members using its services. "The purpose of a cooperative is to provide home ownership, not just apartments to rent. . . . The common bond of collective ownership . . . makes living in a cooperative different. . . . As a rule there is very little turnover in a cooperative." App. 162a, 166a; 421 U.S. at 853–854, 95 S.Ct. at 2061, 44 L.Ed.2d at 633.

Given the characteristics traditionally associated with cooperative interests, restraints on transfer which do not allow plaintiffs to recoup the fair market value for the apartment are not unreasonable; in fact, the restrictions are consonant with the national policy which encourages stability and permanence and discourages speculative investment in housing. Invalidating the restrictions on share transfer would subvert this national policy.

In addition to effectuating a national policy, the Kennedy House right of first refusal at a specified transfer value is clearly valid under state law. Both Delaware, the state of Kennedy House's incorporation, and Pennsylvania, the situs of the building, permit stock restrictions which require the

resale of stock to the issuing corporation.[2] Delaware Corporation Law, Del.Code Ann., tit. 8, § 202(c)(1); Pennsylvania Business Corporation Law of May 5, 1933, P.L. 364, § 613.1(C)(1), as amended, 15 P.S. § 1613.-1(C)(1). This is true even where the shareholders are forced to sell to the corporation at a price lower than the fair market value of the shares. *In Re Mathers Estate*, 410 Pa. 361, 189 A.2d 586 (1963) (held: agreement which required shareholder to offer stock to remaining shareholders for $1 was valid even though the fair market value of the stock was $1,060).

Although cooperative interests are a hybrid of personal and real property rights, restrictions on their transfer have been consistently upheld. *Mowatt v. 1540 Lake Shore Drive Corp.*, 385 F.2d 135 (7th Cir. 1967); *Gale v. York Center Community Cooperative*, 21 Ill.2d 86, 171 N.E.2d 30 (1961); *Weisner v. 791 Park Avenue Corporation*, 6 N.Y.2d 426, 190 N.Y.S.2d 70, 160 N.E.2d 720 (1959); *Penthouse Properties v. 1158 Fifth Avenue*, 11 N.Y.S.2d 417, 256 App.Div. 685 (1939). In *Gale v. York Center Community Cooperative, Inc., supra*, the court noted that "[t]he crucial inquiry should be directed at the utility of the restraint as compared with the injurious consequences that will flow from its enforcement." 171 N.E.2d at 33.

The utility of the restraint here is apparent. It enables the cooperative to ensure that only financially responsible persons who have an incentive to remain will become members of the cooperative; this has consistently been held a valid objective. *Mowatt v. 1540 Lake Shore Drive Corp., supra*. The transfer value formula attendant to the restriction likewise serves a legit-

imate purpose. It enables the corporation to earn a small profit which is applied to reduce the carrying charges; this in effect reduces the charges to those members who remain collective owners of the cooperative. By precluding a profit in times of economic inflation, the transfer formula may discourage speculation on resale and promote a permanency of tenancy which is consonant with the contractual undertaking of the members on joining, the wishes of members who wish to remain, and the national housing policy fostered by the National Housing Act.

The injurious consequences that are alleged to flow from enforcement of the restrictions other than the economic detriment to plaintiffs as departing members are minimal. The supposed rush to leave by persons seeking to avoid ever increasing loss because of the possibility of continued inflation has not eventuated and there is no evidence it will. Nor is there evidence that the decrease in the member's recoverable value on leaving in relation to the "true" market or inflated value has decreased motivation to care for the property by those who stay. Finally, plaintiffs' assertion that if members apply pressure to change the By-Laws or abandon present policy it will some day be unjust to them is no reason for the court to compel injustice to the present members now.

We likewise hold the restrictions on subletting adopted by the Board of Directors are reasonable. A contrary holding would allow plaintiffs to do indirectly what we have held they cannot do directly, that is, to earn a profit by the transfer of their membership. The same analysis regarding the reasonableness of restraints on the sale of

---

2. Federal courts, when exercising their jurisdiction under 28 U.S.C. § 1332, must apply the law, including the conflict of laws rules, of the state in which the district court is located. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The Pennsylvania choice of law rule applicable here depends on how the court characterizes the subject matter of this controversy. If the memberships in Kennedy House are treated as interests in real property, Pennsylvania law would govern. *Quarture v.*

*C. P. Mayer Brick Co.*, 363 Pa. 349, 69 A.2d 422 (1949). If, on the other hand, the court identifies Kennedy House memberships with shareholders' interests in a corporation, the law of Delaware, as the state of corporate domicile under Pennsylvania law, would control. 8A P.L.E. *Corporations* § 109 at 208 (1971); *Cmwlth. v. The Mundy Corp.*, 346 Pa. 482, 484, 30 A.2d 878 (1943). The Alexys' position is without support in the law of either jurisdiction.

cooperative memberships is applicable to restrictions on the subleasing of cooperative units. Consistent with the goals of the National Housing Act, such restrictions prevent the growth of an absentee occupant class of members who buy units to rent to others, rather than to live in themselves.

In *Sanders v. The Tropicana*, 31 N.C.App. 276, 229 S.E.2d 304 (1976), the court upheld the denial of consent to plaintiff's proposed transfer of membership by the cooperative's Board of Directors because the prospective transferee intended to sublet, rather than to occupy, the apartment. The court took careful note of

> . . . the social purpose of choosing one's neighbors. A common provision in the proprietary lease of the tenant-shareholder is the restriction on transfer of the stock and the lease. This is essential because it is the only effective means by which tenants may control occupancy of the apartment, which is of primary interest to tenants who live in close proximity to each other and share common facilities.

229 S.E.2d at 307.

As in *Sanders*, the Alexys in their Occupancy Agreement agreed not to sublet the dwelling unit without the written consent of the Corporation. "Any unauthorized subleasing shall, at the option of the Corporation, result in the termination and forfeiture of the member's right under this Occupancy Agreement." (Exhibit P–8, Art. 7). Therefore, plaintiffs purchased their interest in Kennedy House "with knowledge of the restraint on transfer included in [their] proprietary lease. The board of directors adopted a policy of limiting apartment occupancy to owners. This decision was reasonably necessary to carry out the cooperative purpose." 229 S.E.2d at 309. The Tropicana's restriction on subletting was found not to be arbitrary or capricious, although the Board had earlier approved subletting to at least two non-owners. The Alexys have not made a showing of discriminatory treatment in the application of the subletting policy to them; the restrictions must be sustained as reasonably designed to accomplish the goals of cooperative housing.

Furthermore, it is fundamental that one who benefits from a transaction cannot subsequently avoid it by taking a different position. *E. g., National Forge Co. v. A. W. Carlson*, 452 Pa. 516, 307 A.2d 902 (1973). Plaintiff James A. Alexy is a lawyer, knowledgeable in real estate law and aware of the legal attributes of cooperative housing. The Alexy subscription was approved by the cooperative in reliance on their ratification and acceptance of the By-Law provisions of which they now complain. Plaintiffs lived in Kennedy House for eight years and enjoyed the benefits of the reduced carrying charges made possible by the challenged provisions. Having done so, they are estopped from converting this cooperative to a condominium for their financial benefit to the detriment of the members who remain.

Plaintiffs' expert witness, Jay Lamont, testified to the fair market value of Kennedy House, Apartment 2606, after visiting it and reviewing the documents; he testified to the value of the Alexy apartment if it were freely transferable on the open market as a condominium. While Mr. Lamont would be quite persuasive if plaintiffs owned a fee interest in land transferable on the open market, Mr. Lamont's testimony is irrelevant because plaintiffs do not own a condominium but have a membership share in a cooperative with restrictions on transfer. Because the Alexy apartment is not freely transferable on the open market, it has no "true" fair market value. Plaintiffs' membership in Kennedy House is conceptually quite different from a condominium where one owns an interest in land rather than shares in a corporation. Plaintiffs' economic arguments regarding the validity of the transfer formula in essence urge the court to ignore the special nature of the "cooperative interest" and to equate this interest with that of a condominium.

The instant case is also clearly distinguishable from *Lauderbaugh v. Williams*, 409 Pa. 351, 186 A.2d 39 (1961), in which the court invalidated an agreement which permitted alienation of property only to members of a certain association where member-

ship in the association was left to the whim and caprice of the existing members. In that case the underlying interest was a fee simple and the restriction was a covenant which purported to run with the land.[3] However, plaintiffs in this case do not own a fee interest in land but a membership share in a cooperative which holds title. Moreover, the *Lauderbaugh* court was concerned with the potential for discrimination in membership; in this case there is no evidentiary basis for the suspicion plaintiffs have expressed that the membership process may be administered in such a way as to foster outlawed racial or other discrimination.

Plaintiffs argue that the imposing reality of inflation in our domestic economy gives them the right on terminating their membership in a cooperative to convert it to a condominium by unilateral action. The court can find no support for this in law or social policy. Judgment will be entered for defendants.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action.

2. The provisions of Article III, Section 8 of the Kennedy House By-Laws do not illegally restrain alienation nor are they otherwise against law or public policy.

3. Plaintiffs are bound by their contract as members of Kennedy House with respect to the sale of their membership certificate and with respect to subletting their apartment.

---

**3.** This case is also distinguishable from *Hyatt v. Hyatt*, 417 A.2d 726 (Pa.Super.1979), in which a married couple agreed that on divorce the former husband would remain in occupancy of the former marital domicile, then held by the entireties, in return for his promise to divide the proceeds of any eventual sale with his former wife; this was held an unreasonable restraint on alienation of property, held in common by statute following their divorce, because there was no time limitation under the agreement. Quite apart from differing considerations of public policy in the equitable division of marital property, in that case the former wife had a statutory right to partition not

4. Plaintiffs, having accepted membership in Kennedy House and retained the benefits derived from the By-Laws, particularly Article III, Section 8, as members for eight years, are estopped from avoiding same and have waived any right to object thereto in withdrawing from membership.

5. Plaintiffs, not having established any breach of their contract with Kennedy House, have no right to declaratory relief or to damages.

6. Defendant is entitled to judgment in its favor on both counts.

present here; cooperative members' rights are limited by the By-Laws and their other contractual agreements, including the Regulatory Agreement between the cooperative and with the FHA as insuror, incorporated by reference therein. (Exhibits P–1 and P–2). *But see, Broker v. Kennedy House*, May Term, 1974, No. 2715 (C.P.Phila. August 9, 1976) (transfer of membership in cooperative pursuant to by-laws at designated transfer value held lawful); *Kendall v. Kennedy House, Inc.*, October Term, 1978, (C.P.Phila. November, 1978) (House rules promulgated under Occupancy Agreement held lawful and binding).