

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Josefina, Diana Margarita, Rosalía Elena y Jaime Antonio, todos de apellidos Olivella Zalduondo<br><br>Peticionarios<br><br>v.<br><br>Seguros de Servicios de Salud de Puerto Rico, Inc., t/c/p Triple-S, Inc., y Triple S Management, Inc.<br><br>Recurridos | Certiorari<br><br>2013 TSPR 2<br><br>187 DPR ____ |

Número del Caso: AC-2011-83

Fecha: 8 de enero de 2013

Tribunal de Apelaciones:

      Región Judicial de San Juan, Panel I

Abogados de la Parte Peticionaria:

      Lcdo. Freddie Pérez González
      Lcdo. Federico Pérez Irizarry

Abogado de la Parte Recurrida:

      Lcdo. Fernando J. Collazo Valle

Materia: Cobro de dinero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Josefina, Diana Margarita, Rosalía Elena y Jaime Antonio, todos de apellidos Olivella Zalduondo<br>Peticionarios<br><br>v.<br><br>Seguros de Servicios de Salud de Puerto Rico, Inc., t/c/p Triple-S, Inc., y Triple S Management, Inc.<br>Recurridos | AC-2011-83 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA

> "We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called 'stock', must be considered a transaction simply because the statutory definition of a security includes the words "any…stock".[1]

En San Juan, Puerto Rico, a 8 de enero de 2013.

Nos corresponde determinar la naturaleza jurídica de una acción en cobro de dinero en la que se reclama el pago del valor de unas acciones comunes de una corporación como resultado de una redención. Concluimos que la controversia de autos es de naturaleza contractual entre unos accionistas y la corporación y no constituye una transacción de valores por lo cual no está sujeta a la Ley Uniforme de Valores y, por tanto, al término

---

[1] *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848 (1975).

prescriptivo de dos años, sino al término de quince años para las acciones personales que establece el Código Civil.

I

El 21 de septiembre de 2010, los hijos del doctor Jaime A. Olivella y Josefina Zalduondo Benítez, ambos fallecidos, presentaron una demanda contra Seguros de Servicios de Salud de Puerto Rico, Inc. (Triple S), alegando que su fenecido padre era dueño de seis acciones comunes de Triple S.[2] En particular, alegaron que, en 1999, los accionistas de Triple S crearon la corporación Triple S Management (Management) y votaron por la adquisición y redención de sus respectivas acciones por parte de la nueva corporación. De esa forma, Management se convirtió en la matriz de Triple S "a cambio del pago de las acciones a los accionistas de Triple S".[3]

Según los demandantes, producto de los acuerdos de los accionistas, a sus seis acciones se les otorgó un valor de $250,000 cada una, para un total de $1,500,000. Los demandantes alegaron que, al momento de su muerte en el 2001, el Dr. Olivella seguía siendo dueño de las seis acciones comunes. Ahora bien, según ellos, Triple S ni

---

[2] Según surge de la demanda, el Dr. Olivella falleció el 11 de octubre de 2001 y la señora Zalduondo el 14 de marzo de 2006. Ambos fallecieron sin otorgar testamento. Los demandantes son Josefina, Diana Margarita, Rosalía Elena y Jaime Antonio, todos de apellidos Olivella Zalduondo.

[3] Demanda, pág. 2, Alegación núm. 12.

Management "nunca pagaron al Dr. Olivella, ni a su sociedad legal de gananciales, el valor de la redención de dichas acciones".[4]

Tras la muerte de su madre en el 2006, los demandantes, a través de su representación legal, enviaron varias cartas a diferentes funcionarios de ambas corporaciones solicitando información.[5] El 20 de julio de 2007, los demandantes recibieron una misiva enviada por un representante de la compañía informando que "según nuestro registro de accionistas, el Dr. Jaime A. Olivella Catoni y sus herederos no son accionistas de la [c]ompañía. Las acciones comunes de la [c]ompañía de las cuales era titular el Dr. Olivella fueron redimidas en 2003 por $160.00, el valor pagado por el Dr. Olivella al adquirir dichas acciones. Dicha redención se efectuó conforme a los documentos organizativos de la empresa …

---

[4] *Id.* pág. 3, Alegación núm. 14.

[5] El abogado de los demandantes envió cartas a partir del 19 de mayo de 2006 a diferentes funcionarios de ambas corporaciones. En las primeras misivas, el abogado preguntó sobre la cantidad de acciones poseídas por el Dr. Olivella, el valor de las mismas y los requisitos corporativos para venderlas o transferirlas, entre otros asuntos. Así comenzó un intercambio de correspondencia que duró desde esa fecha hasta el 2009: 9 de noviembre de 2006 (Carta de Management informando que no podían ofrecer información porque la corporación se encontraba en el proceso de convertirse en corporación de emisión de acciones al público), 5 de julio de 2007 (Carta del representante legal de los demandantes), 20 de julio de 2007 (Carta de representante legal de los demandados informando que, según los registros de la compañía, ni el Dr. Olivella ni sus herederos son accionistas de la corporación), 2 de junio de 2009 (Carta del representante legal de los demandantes alegando falta de comunicación por parte de la corporación).

Es importante notar que la [c]ompañía se comunicó con la viuda del Dr. Olivella para informarle sobre la redención. No obstante, surge de nuestros archivos que el valor pagado por la redención no ha sido cobrado. Por tanto, aunque los herederos del Dr. Olivella no son accionistas de la [c]ompañía, sí tienen derecho a recibir el valor pagado en el 2003 al redimirse las acciones comunes de la [c]ompañía que poseía el Dr. Olivella previo a su fallecimiento".[6]

Insatisfechos con la posición de Triple S, los peticionarios presentaron su demanda el 21 de septiembre de 2010 alegando varias causas de acción.[7] En primer lugar, los demandantes sostuvieron que "tiene[n] derecho a que se les pague el precio de sus acciones al valor que fue pagado al resto de los accionistas de Triple S, que se estima en una suma no menor de $1,500,000, más los intereses por mora, desde esa fecha hasta el día que dicha suma se pague".[8] Según los demandantes, se trata de una acción en cobro de dinero. En segundo lugar, solicitaron, al amparo de la Ley General de Corporaciones, examinar los libros de la co-demandada para determinar el valor real de sus acciones y de las transacciones que los demandados han llevado a cabo con

---

[6] Apéndice de Demanda, pág. 27, Exhibit J.

[7] Dado que la demanda fue desestimada sumariamente, nos limitamos a reproducir las alegaciones contenidas en la misma.

[8] Demanda, pág. 4.

las mismas. Según los demandantes, esta causa es parte del deber de rendir cuentas que tiene la compañía. Por último, solicitaron que el Tribunal de Primera Instancia determinara el valor justo de las acciones, ya fuese para que la parte demandada las comprara o, en la alternativa, se les permitiese venderlas en el mercado.

Los demandados presentaron una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil alegando que la causa de acción estaba prescrita. Según ellos, dado que se trataba de una impugnación de la redención de unas acciones y que las redenciones de acciones constituyen transacciones de valores, aplicaba la Ley Uniforme de Valores, la que establece un término prescriptivo de dos años para la presentación de un pleito. Para los demandados, independientemente de la fecha de partida que se tomara,[9] habían transcurrido los dos años establecidos por ese estatuto, por lo que procedía la desestimación de la demanda.[10] Según los

---

[9] Las posibles fechas ofrecidas por los demandados son: 1999 (fecha de la decisión de los accionistas de redimir sus acciones), 2003 (fecha informada por Triple S en su carta del 20 de julio de 2007 como el momento en que se llevó a cabo la redención) o 2007 (fecha de la carta que contenía la información aludida).

[10] Cabe señalar que en su moción de desestimación y a pesar de alegar que la controversia versa sobre una impugnación de redención de acciones sujeta a la Ley de Valores, los demandados expresaron que la reclamación de los demandantes era que, "al redimir las acciones[,] las demandadas no pagaron el valor correcto de las mismas". (Énfasis suplido) Moción de Desestimación, pág. 2; Apéndice de solicitud de apelación, pág. 33. En ese

demandados, "toda transacción relacionada a valores se rige por la Ley Uniforme [de Valores]".[11] En particular, adujeron que la ley aplicaba "pues se trata de una reclamación en la cual se impugna una transacción en la cual estuvo involucrado un valor …[e]n este caso, la transacción que se impugna es una redención de seis (6) acciones alegadamente llevada a cabo por los demandados en 1999".[12] Es decir, dado que la controversia involucraba un "valor", que la redención de unas acciones es una transacción de valor y que se estaba cuestionando el valor pagado como resultado de dicha redención, aplicaba el término prescriptivo establecido por la Ley Uniforme de Valores.

En su oposición, los demandantes sostuvieron que la Ley de Valores aplica únicamente cuando se alega fraude o engaño en una transacción llevada a cabo por una entidad que se dedica al negocio de valores, como agentes, corredores u otros, y que la transacción entre Triple S y Management no está comprendida entre las transacciones de venta de valores cubiertas por dicha ley. De igual forma, cuestionaron la caracterización de los demandantes de su causa de acción como una impugnación de redención de

---

sentido, aparentan reconocer que la causa de acción de los demandantes es de cobro de dinero.

[11] (Énfasis suplido.) Moción de desestimación, pág. 6; Apéndice de solicitud de apelación, pág. 37.

[12] (Énfasis suplido.) Moción de desestimación, pág. 8; Apéndice de solicitud de apelación, pág. 39.

acciones, pues lo único que estaban reclamando era que se les pagara el precio total correspondiente al valor de sus acciones.

Ambas partes hicieron referencia a nuestra decisión en PaineWebber, Inc. v. First Boston, Inc. para sostener sus alegaciones.[13] Según los demandados, en dicho caso resolvimos que a toda causa de acción que involucre un valor o una transacción de valores le aplicará el término prescriptivo establecido por la Ley Uniforme de Valores. Por su parte, los demandantes plantean que esa decisión no aplica a los hechos de la controversia de autos. Según estos, la decisión en PaineWebber era sobre una controversia entre dos entidades dedicadas a la compra y venta de valores, reguladas por el Comisionado de Instituciones Financieras, en la que una reclamó a la otra por incumplimiento de contrato en cuanto a la compra de unos valores a ser revendidos a inversionistas. Distinguiendo esa controversia de los hechos de autos, los demandantes insisten en que ni ellos ni los demandados son casas de corretaje o se dedican al negocio de valores, que no hay una disputa sobre la compra o venta de valores y que no ha habido alegación alguna de fraude. Por lo tanto, entienden que no aplica la Ley de Valores. En ese sentido, insisten en que no están impugnando la redención de valores llevada a cabo, más

---

[13] PaineWebber, Inc. v. First Boston, Inc., 136 D.P.R. 541 (1994).

bien han instado una reclamación de naturaleza contractual para que se les pague el valor de las acciones.[14]

El Tribunal de Primera Instancia desestimó la demanda por prescripción al concluir que se estaba impugnando una transacción en la cual estaba involucrado un valor, por lo cual el término prescriptivo es de dos años contados a partir de la fecha de la transacción impugnada.[15] Inconformes, los demandantes recurrieron al Tribunal de Apelaciones. El foro intermedio confirmó la sentencia del tribunal de instancia en todos sus extremos, al concluir que la demanda presentada por los peticionarios era una impugnación de una transacción que "atañe a un valor" y, por lo tanto, aplicaba el término prescriptivo establecido por la Ley de Valores.[16] Los demandantes apelaron entonces a este Tribunal. El 20 de

---

[14] Los demandantes sostienen que "[l]a Ley de Valores de Puerto Rico se legisló con el propósito de proteger a los inversionistas contra el engaño y fraude por los agentes y entidades dedicadas al negocio de valores y el término de prescripción que allí se establece es para las acciones por engaño y fraude que a tal fin establece dicha ley. La presente demanda no alega engaño o fraude, ni las demandadas se dedican al negocio de venta o corretaje de valores". Oposición a la moción de desestimación, pág. 11; Apéndice de solicitud de apelación, pág. 57. En su réplica, los demandados insisten en que la Ley Uniforme de Valores aplica a toda reclamación "cuya base sea una transacción que involucre valores". Apéndice de solicitud de apelación, pág. 75.

[15] Sentencia del Tribunal de Primera Instancia, pág. 2.

[16] Sentencia del Tribunal de Apelaciones, pág. 7.

enero de 2012 acogimos la apelación como un *certiorari* y expedimos el auto.

Los demandantes rechazan el que la Ley Uniforme de Valores o nuestra decisión en PaineWebber sea aplicable al caso de autos "por el mero hecho de que la demanda envuelve certificados de acciones".[17] Se reafirman en que no han hecho alegación alguna de fraude, que Triple S no se dedica al mercado de valores y que no hubo un contrato de venta de acciones para impugnar.[18] Por el contrario, sostienen que el "propósito de la Ley de Valores es proteger a los inversionistas y al público en general, mediante la exigencia de ciertos requisitos, a las personas que se dediquen al negocio de valores".[19]

Por su parte, Triple S enfatiza en que el propósito de la Ley de Valores es "no imponer cargas indebidas sobre el emisor de valores de que se trate",[20] e insiste

---

[17] Apelación, pág. 9. Los peticionarios incluyeron otros señalamientos de error por parte del Tribunal de Apelaciones. Dado que el primer error es dispositivo, no los atenderemos.

[18] Los peticionarios también hacen referencia a una excepción contenida en la Ley Uniforme de Valores que expresamente excluye de su aplicabilidad a transacciones que surgen de una reorganización corporativa. Según ellos, el proceso de aprobación de la redención de las acciones de Triple S y creación de Management como la nueva entidad matriz constituye una reorganización corporativa.

[19] Apelación, pág. 11, citando nuestra decisión en PaineWebber, *supra*, pág. 544.

[20] Alegato de los Recurridos, pág. 2, citando nuestra decisión en PaineWebber, *supra*, pág. 546. Aducen que excluir este tipo de acción del término establecido por

en que la acción de los demandantes equivale a una impugnación de la redención llevada a cabo. Por consiguiente, rechazan que la Ley de Valores aplique únicamente cuando haya una alegación de fraude o esté involucrada una entidad que se dedique específicamente al mercado de valores. En vez, entienden que el estatuto incluye a quienes emiten los mismos, aunque no se dediquen al negocio de valores.

## II

La Ley Uniforme de Valores se aprobó en 1963,[21] con el propósito de "proteger a los inversionistas y al público en general mediante la exigencia de ciertos requisitos **a las personas que se dediquen al negocio de valores** y la creación de un organismo gubernamental con poderes de supervisión y fiscalización sobre diversas fases del negocio, a los fines de evitar que se incurra en prácticas fraudulentas en el curso del mismo".[22] Dado que en Puerto Rico no existía legislación alguna que regulara directamente la materia y que la Asamblea Legislativa concluyó que las disposiciones del Código

---

la Ley de Valores resultaría en una avalancha de casos de "personas que, luego de largos años, decidan impugnar transacciones de valores, como lo son transacciones relacionadas con acciones corporativas como la[s] de este caso". (Énfasis suplido) *Id*, pág. 5.

[21] Ley Núm. 60 de 18 de junio de 1963; 10 L.P.R.A. secs. 851 *et seq*. Este estatuto fue actualizado mediante la Ley Núm. 114 de 1996.

[22] (Énfasis suplido.) Informe Conjunto, Comisiones de lo Jurídico Civil e Industrias y Comercio del Senado de Puerto Rico, 17 Diario de Sesiones T. 4, pág. 1629.

Civil y el Código de Comercio eran insuficientes para atender este problema social, hacía falta aprobar un estatuto especial. La preocupación de la Asamblea Legislativa era, sin lugar a dudas, lidiar con situaciones de "prácticas fraudulentas en la distribución de valores".[23]

Según el Informe Conjunto de las Comisiones de lo Jurídico Civil e Industrias y Comercio del Senado de Puerto Rico, la nueva Ley de Valores estaría dividida en cuatro partes fundamentales. La primera prohibía "prácticas fraudulentas en relación con el negocio de valores".[24] La segunda exigía la inscripción de todos los agentes y corredores-traficantes de valores, mientras que en la tercera se exigía la inscripción de todos los valores propiamente. Por último, el estatuto establecía las disposiciones generales para la administración de la ley.[25] De lo anterior surge un claro propósito legislativo: evitar que las personas dedicadas al negocio de valores incurran en prácticas engañosas y fraudulentas en sus transacciones que puedan afectar al público inversionista.

El artículo 101 de la Ley Uniforme de Valores establece que será ilegal que cualquier persona, en

---

[23] (Énfasis suplido.) *Id*.

[24] (Énfasis suplido.) *Id*.

[25] *Id*.

relación con la oferta, venta o compra de cualquier valor, directa o indirectamente:

(1) Emplee cualquier treta, ardid o artificio con el propósito de defraudar;

(2) Haga cualquier manifestación falsa sobre un hecho material necesario para evitar que las declaraciones formuladas, a la luz de las circunstancias bajo las cuales se hicieron, conduzcan a error;

(3) Se dedique a cualquier acto, práctica, o clase de negocio que opere u operaría como fraude o engaño sobre cualquier persona;

(4) Emita, circule o publique cualquier material impreso o por medios electrónicos que contenga representación falsa sobre un hecho material, u omita información sobre un hecho material necesario de forma que la información que se emita, circule o publique, a la luz de las circunstancias en que fue emitida, circulada o publicada, conduzca a error, o

(5) Emita, circule o publique cualquier material, o realice cualquier representación escrita, a menos que el nombre de la persona que emita, circule, publique o haga la misma, y el hecho de que es esa persona quien emite, circula, publica o hace la representación, esté claramente indicado en esa misma comunicación.[26]

Los artículos subsiguientes de la Ley de Valores atienden materias similares, como el fraude en las actividades consultivas y las manipulaciones del mercado mediante información falsa o engañosa.[27] Como se adelantara en el Informe Conjunto, esta primera parte de

---

[26] 10 L.P.R.A. sec. 851. Los incisos (4) y (5) fueron añadidos por la Ley Núm. 114 de 1996.

[27] *Véanse* 10 L.P.R.A. secs. 852 y 853.

la Ley se enfoca en prohibir actividades fraudulentas por las personas que se dedican al negocio de valores.

Los artículos contenidos en el segundo subcapítulo de la Ley establecen los requisitos y procedimientos para la inscripción de los corredores, agentes y otras entidades que llevan a cabo transacciones de valores.[28] Acto seguido, los artículos 301 al 307 atienden la inscripción propiamente de los valores.[29] Finalmente, los artículos 402 en adelante establecen las disposiciones generales de la ley.[30] Cabe destacar que el antiguo artículo 401, que ofrece una lista de las definiciones de los términos empleados en el estatuto, fue renumerado como el artículo 100.[31] De lo anterior se puede colegir que la estructura estatutaria coincide con el propósito legislativo plasmado en el Informe Conjunto.

El artículo 410 del estatuto establece las circunstancias en las que habrá responsabilidad civil, así como los requisitos para presentar una causa de acción a su amparo:

(a) Cualquier persona que:

(1) Ofrezca o venda un valor en violación a las [secciones]

---

[28] 10 L.P.R.A. secs. 861-864.

[29] 10 L.P.R.A. secs. 871-877.

[30] 10 L.P.R.A. secs. 882-898. La sección 882 establece una lista de numerosas exenciones a la aplicación de la Ley de Valores.

[31] 10 L.P.R.A. sec. 881.

861(a),[32] 871,[33] u 885(b)[34] de este título, o a cualquier reglamento u orden conforme a la [sección] 883 de este título la cual requiere la aprobación afirmativa de propaganda de venta antes de que el mismo se use, o de cualquier condición impuesta con arreglo a las [secciones] 874(d), 875(g) u 875(h) de este título; o

(2) Ofrezca o venda un valor por medio de una declaración falsa sobre un hecho material, o mediante omisión de consignar un hecho material necesario para evitar que las declaraciones formuladas, a la luz de las circunstancias bajo las cuales se hicieron, conduzcan a error (desconociendo el comprador la falsedad o la omisión), y que no sostenga el peso de la prueba de que no sabía, y que ejercitando una prudencia razonable, no pudo tener conocimiento, de la falsedad u omisión, será responsable a la persona que le compre el valor; quien podrá entablar una demanda para recobrar el precio pagado por el valor, además de intereses al tipo de interés aplicable a sentencias judiciales… costas y

---

[32] "Será ilegal que cualquier persona haga negocios como corredor-traficante o agente en Puerto Rico a menos que esté inscrito según las disposiciones de este capítulo". 10 L.P.R.A. sec. 861(a), dentro del subcapítulo relacionado con la inscripción de las personas que se dedican al negocio de valores.

[33] "Será ilegal que cualquier persona ofrezca o venda cualquier valor en Puerto Rico a menos que: (1) Dicho valor haya sido inscrito bajo las disposiciones de este capítulo; (2) el valor o transacción esté exento bajo las disposiciones de la sec. 882 de este título, o (3) el valor en cuestión es un valor bajo cubierta federal". 10 L.P.R.A. sec. 871, dentro del subcapítulo que cobija la inscripción de valores.

[34] "Será ilegal hacer, o inducir que se haga, a cualquier comprador o cliente potencial, cualquier representación inconsistente con el inciso (a) de esta sección". 10 L.P.R.A. sec. 885(b).

> razonables honorarios de abogado menos la cuantía de cualquier ingreso que haya recibido derivado del valor, al ofrecer devolver dicho valor, o por daños y perjuicios, si él ya no es dueño del valor…
>
> (b)
> (c)
> (d)
> (e) Ninguna persona podrá entablar una demanda civil de acuerdo con las disposiciones de **esta sección**, después de transcurridos más de dos (2) años de haber efectuado el contrato de venta…[35]

Por último, el nuevo artículo 100 ofrece las definiciones estatutarias. A continuación, ofrecemos las más pertinentes a la controversia de autos:

> (a) …
> (b) Agente – Significará cualquier individuo que no sea un corredor-traficante, que represente a un corredor-traficante, o a un emisor, al llevar a cabo o tratar de llevar a cabo la compra o la venta de valores. La palabra "agente" no incluye a un individuo que represente a:
>> (1) Un emisor…
>> (2) Un corredor-traficante…
>
> (c) Corredor-traficante – Significará cualquier persona que se dedique a llevar a cabo transacciones en valores, ya sea por cuenta propia o a cuenta de otros. El término "corredor-traficante" no incluirá:
>> (1) Una instrumentalidad gubernamental
>> (2) un agente;
>> (3) un emisor;
>> (4) un banco, institución de ahorros o compañía de fideicomiso con facultades bancarias, siempre y cuando las actividades de estas instituciones relacionadas con el negocio de valores se limiten a aquellas categorías enumeradas en [varios incisos de este capítulo].

---

[35] (Énfasis suplido.) 10 L.P.R.A. sec. 890.

(d) Fraude, engaño y defraudar – No estarán limitados a la definición de dolo según el Código Civil.

(e) …

(f) …

(g) Emisor – Significará cualquier persona que emita o se proponga emitir cualquier valor…[36]

(h) …

(i) …

(j)

    (1) Venta o vender – Incluirá todo contrato de venta de, contrato para la venta, o disposición de un valor, o interés en un valor, a título oneroso…

(k) …

(l) Valor – Significará cualquier pagaré, <u>acción</u>, acciones en cartera, bono, vale, comprobante de deuda, certificado de interés o participación en algún convenio de distribución de beneficios o sociedad, certificado de valores fiduciarios en garantía, certificado de preorganización o subscripción, acción transferible, contrato de inversión, certificado de fideicomiso con derecho a voto, certificado de depósito en garantía, cuota de interés indiviso en petróleo, gas u otros derechos sobre minerales, o, en general, cualquier interés o instrumento conocido comúnmente como "valor", o cualquier certificado de interés o participación en cualquiera de los precedentes valores, certificado temporero o provisional o recibo por los mismos, garantía de dichos valores o instrumentos de autorización u opción o derecho para suscribirlos. "Valor" no incluirá ninguna póliza de seguro, o de seguro dotal, ni contrato de anualidades mediante la cual una compañía de seguros se compromete a pagar una suma determinada de dinero, sea ésta pagadera en suma englobada o periódicamente, durante la vida de la persona o en cualquier otro período especificado.[37]

---

[36] La Ley establece unas excepciones a esta definición, pero no son pertinentes a la controversia de autos.

[37] (Énfasis suplido.) 10 L.P.R.A. sec. 881.

La única ocasión en la que hemos tenido la oportunidad de interpretar este estatuto fue en PaineWebber, Inc. v. First Boston Inc..[38] En esa ocasión, PaineWebber acordó con First Boston la compraventa de un valor conocido como *Ginnie Mae*, que fue entregado a la primera y pagado por ésta en 1987. Acto seguido, PaineWebber revendió el valor a inversionistas. En 1989, PaineWebber descubrió que el valor adquirido de First Boston no era exento de contribuciones, por lo que se vio obligado a resolver la venta realizada y a resarcirle a sus clientes por los daños causados. Como consecuencia, PaineWebber demandó a First Boston por incumplimiento de contrato, solicitando la devolución del precio pagado por los valores, más daños y perjuicios. First Boston planteó que la acción estaba prescrita, por haber transcurrido más de dos años, es decir, el término prescriptivo establecido por la Ley Uniforme de Valores.

La controversia en ese caso giró en torno a la sección 890(h) de la Ley Uniforme de Valores que establece que los "derechos y remedios provistos por este capítulo son en adición [*sic*] a cualesquiera derechos o remedios que pueden existir…".[39] Es decir, se cuestionaba si el término prescriptivo de dos años establecido en la

---

[38] Es importante señalar que la Ley Uniforme de Valores fue enmendada después de nuestra decisión en este caso. Discutiremos esto más adelante en la Opinión.

[39] 10 L.P.R.A. sec. 890(h).

sección 890(e) era exclusivo para los casos en los que se impugnaba una transacción de valores. A la luz de los hechos en ese caso, resolvimos en la afirmativa.

Ahora bien, como explica el profesor Díaz Olivo, tanto la Opinión mayoritaria como la disidencia en PaineWebber "coinciden al calificar de mercantil la compraventa entre PaineWebber y First Boston. Esta calificación se fundamentó en lo dispuesto en el artículo 243 del Código de Comercio, y en las interpretaciones del propio Tribunal [Supremo] al efecto de que el elemento que distingue principalmente a la compraventa mercantil es la presencia del doble propósito de revender las cosas compradas y obtener un lucro".[40] De igual forma, el profesor toma nota de que, en ese caso, la demandante PaineWebber era una "empresa dedicada al negocio de corretaje, donde en múltiples ocasiones lleva a cabo transacciones con valores exentos y no exentos…".[41] Es decir, se trataba de una entidad dedicada al negocio de valores y no de una corporación cualquiera. Más aún, se trataba de una transacción de naturaleza mercantil.

En ese sentido, nuestra decisión en PaineWebber partía de la premisa de que la Ley Uniforme de Valores aplicaba a los hechos de ese caso, pues no había controversia de que se trataba de una transacción de

---

[40] (Énfasis suplido.) C. Díaz Olivo, Análisis del Término: Derecho Mercantil, 64 Rev. Jur. U.P.R. 861, 862 (1995).

[41] Id. pág. 868.

valores llevada a cabo por dos compañías dedicada a ese negocio. Por lo tanto, no tuvimos la oportunidad de resolver en qué circunstancias hay que recurrir a la Ley de Valores.

Aun así, nuestro análisis en PaineWebber es muy útil para precisar cuáles son esas circunstancias. En aquella ocasión explicamos, de entrada, que la Ley Uniforme de Valores "fue creada con el propósito de establecer en Puerto Rico una reglamentación protectora para el inversionista en el negocio de valores".[42] De igual forma, citamos extensamente del Informe Conjunto del Senado, al que también hemos hecho referencia en esta Opinión.[43] En ese contexto, resolvimos que las "transacciones de valores en Puerto Rico están regidas por la Ley Uniforme de Valores"[44] y recalcamos que los hechos particulares del caso, entiéndase, una controversia sobre una compraventa entre dos entidades dedicadas al negocio de valores, "enmarca[ban] perfectamente en los supuestos contenidos en la Ley Uniforme de Valores".[45] No se trataba, pues, de que toda controversia que involucrara un valor estaría

---

[42] (Énfasis suplido) PaineWebber, *supra*, pág. 543.

[43] En particular, enfatizamos en el propósito legislativo, según explicado en el Informe Conjunto, entiéndase, la protección a los inversionistas y al público en general a los fines de evitar que se incurra en prácticas fraudulentas en la compraventa de valores. *Id*. pág. 544.

[44] *Id*.

[45] *Id*. pág. 545.

sujeta a ese estatuto, sino de que los hechos particulares de cada controversia deben coincidir con los supuestos estatutarios. Por eso resolvimos que la Ley Uniforme de Valores "regula **un tipo específico de relación comercial**".[46] Es decir, no toda relación comercial en la que esté presente un valor está al alcance de esa ley.

Después de nuestra decisión en PaineWebber, *supra*, la Asamblea Legislativa aprobó la Ley Núm. 114 del 11 de agosto de 1996 para actualizar la Ley Uniforme de Valores. La Exposición de Motivos de este estatuto hace referencia a la aprobación original de la Ley Uniforme de Valores, expresando que ésta fue adoptada, a su vez, del "*Uniform Securities Act*" de 1956, la cual, al 1996, había sido adoptada por cuarenta y una jurisdicciones en los Estados Unidos.[47] Reconociendo que la Ley Uniforme de Valores de 1963 "ha cumplido bien con los propósitos por los que se aprobó", la Ley Núm. 114 tenía como objetivo "ampliar y clarificar las definiciones sobre prácticas fraudulentas".[48] Cabe destacar que los cambios principales introducidos por la Ley Núm. 114 se refieren a fiscalización y exenciones. El marco general de la Ley de Valores de 1963 quedó intacto.

---

[46] (Énfasis suplido.) *Id*. pág. 547.

[47] Leyes de Puerto Rico, 1996, pág. 490.

[48] (Énfasis suplido.) *Id*.

El Informe Conjunto del Senado sobre el proyecto que se convertiría en la Ley Uniforme de Valores de 1963, en el cual descansó fuertemente nuestra Opinión en PaineWebber, revela la preocupación de la Asamblea Legislativa por evitar las "prácticas fraudulentas en el mercado de valores". Sobre esto expresa que, a pesar de que "[e]n Puerto Rico, no hemos tenido hasta el presente ningún problema serio relacionado con prácticas fraudulentas en el mercado de valores[,] [n]o obstante, debemos prevenir [para] que ello no ocurra en el futuro. La adopción de un estatuto tipo 'Blue Sky' redundará en una mayor protección del público inversionista y de aquellas personas y entidades que se dedican al negocio de valores en nuestra comunidad".[49] Al hacer referencia directa a las llamadas leyes "Blue Sky", el Informe Conjunto explicó que "[l]a legislación que se propone ha sido cuidadosamente confeccionada para proveer la mayor protección posible al inversionista sin imponer cargas indebidas sobre el emisor de valores ni sobre el negociante en los mismos … Cabe indicar, además, que esta propuesta medida legislativa ha sido objeto de extensa interpretación judicial en las diferentes jurisdicciones estatales, así como, también, en el nivel federal".[50]

---

[49] (Énfasis suplido.) Informe Conjunto del Senado, *supra*, págs. 1629-30.

[50] *Id.* pág. 1630.

En efecto, los llamados *"Blue Sky Laws"* tienen como propósito principal "la protección al público del engaño y el fraude en las transacciones de valores".[51] Se les da este nombre porque su objetivo es evitar los "esquemas especulativos que no tienen más fundamento que tantos pies de cielo azul".[52] Se trata de leyes aprobadas a nivel estatal, muchas de las cuales utilizan el modelo de la *Uniform Securities Act* de 1956.[53]

Desde 1910, la mayoría de las jurisdicciones en Estados Unidos han adoptado leyes para evitar la "venta o intercambio fraudulento de valores".[54] Según los tratadistas, los estatutos son de tres tipos: (1) para evitar el fraude, (2) para requerir el registro o inscripción de los corredores de valores o (3) para requerir el registro o inscripción de los valores

---

[51] "The primary purpose of these 'blue sky laws' is the protection of the public from deceit and fraud in securities transactions". S. Christianson, What Gives Rise to Right of Rescission under State Blue Sky Laws, 52 A.L.R. 5th 491, 499 (Sup. 2009).

[52] "[S]peculative schemes which have no more bases than so many feet of 'blue sky'". Loss & Cowett, Blue Sky Law, Little, Brown and Co., 1958, pág. 13, citando a Hall v. Geiger-Jones Co., 242 U.S. 539, 550 (1917).

[53] Christianson, *supra*, págs. 502-503. Otras leyes federales de esta naturaleza son la *Securities Act of 1933* y la *Securities Exchange Act of 1934*.

[54] "[F]raudulent sale or Exchange of securities". Loss & Cowett, *op. cit.*, pág. 17.

mismos.[55] Su fin principal es, sin duda, la prevención del fraude en las transacciones de valores.[56] Algunas jurisdicciones, como Puerto Rico, adoptaron leyes que incluyen los tres elementos.[57] De igual forma, los tratadistas han tomado nota de que los entes regulados por estas leyes son los bancos, firmas de valores y otras entidades dedicadas al negocio de valores,[58] mientras que el sujeto protegido es el público inversionista.[59]

Por último, tanto los tratadistas como los tribunales en Estados Unidos se han enfrentado a la pregunta de qué constituye un "valor" para efectos de los "*Blue Sky Laws*", particularmente ante argumentos de que toda transacción que involucre un valor está cobijada automáticamente por dichos estatutos. En ese sentido, señalan que es necesario "determinar en cada instancia si un valor es, de hecho, de tal naturaleza como para caer justamente dentro del alcance del estatuto".[60] Por eso, en United Housing Foundation, Inc. v. Forman, el Tribunal

---

[55] *Id*. pág. 19. Véase, además, 87 A.L.R. 43; Loss, Seligman & Paredes, Securities Regulation, 4th ed., 2006, v. 1, pág. 157.

[56] Loss & Cowett, *op. cit.*, págs. 12 y 129.

[57] *Véase* Loss, Seligman & Paredes, *op. cit.*, n. 197 en la que se hace referencia directa a nuestra Ley Uniforme de Valores.

[58] Loss & Cowett, *op. cit.*, pág. 28.

[59] 87 A.L.R. 43.

[60] "[T]o determine in each instance whether a security is in fact of such a character as fairly to fall within the scope of the statute". *Id*. pág. 75.

Supremo de Estados Unidos resolvió que el enfoque de las leyes reguladoras federales es regular "la venta de valores para obtener capital con el propósito de generar ganancias, los mercados en los que se intercambian esos valores y la necesidad de regular para evitar el fraude y proteger los intereses de los inversionistas".[61] Por lo tanto, no será suficiente la mera presencia de un valor en una controversia para concluir que se trata de una transacción de valores sujeta a lo establecido por las leyes "*Blue Sky*". En particular, el que la Ley de Valores regule las transacciones de valores y una acción se considere un valor para efectos de la definición estatutaria, no equivale, sin más, a que se esté siempre ante una transacción de valores sujeta a un estatuto de esta naturaleza. El máximo foro federal lo explica así:

> We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock", <u>must be considered a security transaction **simply because the statutory definition of a security included the words "any … stock"**</u>.[62]

---

[61] "[T]he sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interests of investors". <u>United Housing Foundation, Inc. v. Forman</u>, 421 U.S. 837, 849 (1975).

[62] (Énfasis suplido.) *Id*. pág. 848. Citando, a su vez, a <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336 (1967), el Tribunal Supremo federal explica que "en la búsqueda de la definición y alcance de la palabra 'valor' en los estatutos, la forma debe ser sustituida por la sustancia y el énfasis debe ser en la realidad económica". ("In searching for the meaning and scope of the word 'security' in the Acts, form should be disregarded for substance and the emphasis should be on economic reality". *Id*. pág. 848.

III

La Ley Uniforme de Valores de 1963, según enmendada, no aplica automáticamente a todas las controversias en las que se vea involucrado un valor. Por el contrario, como explicamos en PaineWebber, el estatuto regula un tipo específico de relación comercial. Se trata de relaciones mercantiles entre inversionistas y entidades que se dedican al negocio de valores, o entre varias entidades de esta naturaleza, como ocurrió en el caso de PaineWebber. En particular, nuestra Ley de Valores se concentra, por un lado, en evitar que entidades dedicadas a dicho negocio cometan fraude en las transacciones de valores y, por el otro, en asegurarse de que tanto los valores que se intercambien, como las personas que se dedican a este tipo de transacción estén debidamente registradas. Claro está, lo anterior no significa que la Ley de Valores aplicará únicamente a aquellos casos en los que se alegue fraude. Pero sí es necesario que se trate de una controversia centrada en una transacción de valores que incluya inversionistas o, al menos, entidades cuya actividad principal sea el negocio de valores.

En resumen, para determinar si aplica la Ley Uniforme de Valores, debe analizarse si la controversia versa sobre una transacción de valores llevada a cabo por entidades dedicadas a ese negocio, sin perder de perspectiva que el propósito principal, aunque no exclusivo, de dicha Ley es evitar el fraude y asegurar la

debida inscripción de los valores y sus corredores. De igual forma, debe recordarse que, como explica el profesor Díaz Olivo, el elemento que distingue principalmente a la compraventa mercantil es la presencia del doble propósito de revender las cosas compradas y obtener un lucro.

No estamos ante una ley especial de alcance amplio. Por el contrario, la eficacia de dicho estatuto está limitada por las propias disposiciones de la ley. En lo que concierne la responsabilidad civil que permite la presentación de una causa de acción privada, la Ley Uniforme de Valores establece expresamente los elementos necesarios para poder entablar un pleito legal. Incluso, el artículo 410 del estatuto limita las causas de acción civil sujetas a sus disposiciones a las que surgen por violaciones al artículo 201(a) –que la persona que vendió el valor no está debidamente registrada–; al artículo 301 –que el valor comprado o vendido no está debidamente registrado–; al artículo 405(b) –hacer representaciones ilegales concernientes a inscripciones o exenciones–; o al propio artículo 410(a)(2) –ofrecer o vender un valor dolosamente–. Si la causa de acción no recae sobre alguno de estos elementos, no está sujeta al término prescriptivo establecido en el artículo 410(e). Evidentemente, una controversia contractual entre un accionista y una corporación que no se dedica al negocio de valores, sobre la redención de las acciones del

primero, y su correspondiente pago, no están dentro del alcance de la Ley de Valores.

La postura de Triple S nos parece poco persuasiva y muy simplista. Insiste en una aplicación injustificadamente amplia de la Ley Uniforme de Valores para incluir toda transacción que involucre una acción, sin más. Los recurridos basan su argumento en que la Ley Uniforme define una acción como un valor, las transacciones de valores están cobijadas por dicho estatuto y una redención de acciones es una transacción. La suma de esos factores no conlleva, sin más, que se trata de una actividad al palio de ese estatuto. Tal interpretación es insostenible.

Hemos visto que el propio Tribunal Supremo de Estados Unidos ha descartado esa interpretación mecánica. El mero hecho de que la definición estatutaria de valor incluya las acciones no equivale a que toda controversia sobre el pago del precio de una acción esté regulada por la Ley Uniforme de Valores. También hemos constatado que la Ley Uniforme de Valores tiene un enfoque muy estrecho: evitar el fraude, proteger a los inversionistas, regular el mercado de valores y a las personas y entidades que se dedican a ello.

En el caso de autos, la sucesión del Dr. Olivella alega que, en 1999, los accionistas de Triple S decidieron redimir sus acciones por un precio de $250,000 cada una. Según ellos, Triple S nunca les pagó dicha

cantidad. Por eso instaron una <u>acción en cobro de dinero</u>. No se trata de una corporación que se dedique al negocio de valores, sino de una <u>compañía dedicada a la industria de seguros</u>. No hay una transacción de valores de naturaleza mercantil. Por el contrario, estamos ante una relación contractual clásica que gira en torno a unas acciones que ciertamente constituyen un valor. Tampoco se trata de una compraventa de valores en la que hubo fraude, dolo o engaño. Por tanto, es forzoso concluir que el término prescriptivo aplicable no es el de dos años establecido por la Ley Uniforme de Valores, sino el de quince años establecido por el Código Civil. La demanda no está prescrita. Erraron los tribunales inferiores al concluir lo contrario.

Por lo anteriormente expuesto, se revoca la sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la celebración de los procedimientos de manera consistente con esta Opinión.

Se dictará sentencia de conformidad.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Josefina, Diana Margarita, Rosalía Elena y Jaime Antonio, todos de apellidos Olivella Zalduondo<br>          Peticionarios<br><br>          v.<br><br>Seguros de Servicios de Salud de Puerto Rico, Inc., t/c/p Triple-S, Inc., y Triple S Management, Inc.<br>          Recurridos | AC-2011-83 | *Certiorari* |

*SENTENCIA*

En San Juan, Puerto Rico, a 8 de enero de 2013.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la Sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la celebración de los procedimientos de manera consistente con esta Opinión.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Presidente señor Hernández Denton y la Jueza Asociada señora Pabón Charneco disienten sin opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo